# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNION DE EMPLEADOS DE MUELLES DE PUERTO RICO PRSSA WELFARE PLAN, and UNION DE EMPLEADOS DE MUELLES DE PUERTO RICO AP WELFARE PLAN, individually and on behalf of all others similarly situated, and derivatively on behalf of PUERTO RICO FIXED INCOME FUND II, INC., PUERTO RICO FIXED INCOME FUND III, INC., PUERTO RICO FIXED INCOME FUND IV, INC., and TAX-FREE PUERTO RICO FUND II, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO; UBS TRUST COMPANY OF PUERTO RICO; MIGUEL A. FERRER; CARLOS V. UBIÑAS; STEPHEN C. ROUSSIN; LESLIE HIGHLEY, JR.; MARIO S. BELAVAL; AGUSTIN CABRER-ROIG; GABRIEL DOLAGARAY-BALADO; CARLOS NIDO; LUIS M. PELLOT-GONZÁLEZ; VICENTE J. LEON; CLOTILDE PÉREZ; and DOES 1 through 100, <br> Defendants, <br><br> v. <br><br> PUERTO RICO FIXED INCOME FUND II, INC., PUERTO RICO FIXED INCOME FUND III, INC., PUERTO RICO FIXED INCOME FUND IV, INC. and TAX-FREE PUERTO RICO FUND II, INC., <br> Nominal Defendants. | No.: _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE ACTION AND CLASS ACTION COMPLAINT FOR BREACHES OF FIDUCIARY DUTY, VIOLATIONS OF THE SECURITIES LAWS, VIOLATIONS OF ERISA, AND BREACHES OF THE DUTY OF GOOD FAITH** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Union de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan ("UDEM PRSSA") and Union de Empleados de Muelles de Puerto Rico AP Welfare Plan ("UDEM AP" and, together with UDEM PRSSA, the "Plaintiffs"), by and through their attorneys, bring this action derivatively on behalf of Nominal Defendants Puerto Rico Fixed Income Fund II, Inc. ("Fund II"), Puerto Rico Fixed Income Fund III, Inc. ("Fund III"), Puerto Rico Fixed Income Fund IV, Inc. ("Fund IV"), and Tax-Free Puerto Rico Fund II, Inc. ("Tax-Free Fund II") (Funds II, III, and IV and Tax-Free Fund II collectively referred to hereafter as "the Funds"), and on behalf of a Class (as defined herein) of similarly situated shareholders of the Funds, against Defendants UBS Financial Services Incorporated of Puerto Rico ("UBS Financial"), UBS Trust Company of Puerto Rico ("UBS Trust and, together with UBS Financial, the "UBS Defendants"), Miguel A. Ferrer, Carlos V. Ubiñas, Stephen C. Roussin, Leslie Highley, Jr., Mario S. Belaval, Agustin Cabrer-Roig, Gabriel Dolagaray-Balado, Carlos Nido, Luis M. Pellot-González, Vicente J. Leon, and Clotilde Pérez (collectively, the "Director Defendants" and, together with the UBS Defendants, the "Defendants").

The allegations herein are based on personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief (including the extensive investigation of counsel and review of publicly available information) as to all other matters stated herein.

## NATURE AND SUMMARY OF THE ACTION

1.    Defendants violated federal laws and breached and/or aided and abetted in the breach of fiduciary and other duties owed to the Funds, Plaintiffs, and other members of the Class by engaging in a series of transactions fraught with conflicts of interest and

designed to benefit Defendants to the detriment of the Funds, Plaintiffs and other members of the Class.

2.      Defendants – all affiliated with the Swiss financial giant UBS AG – seized upon unique aspects of the Puerto Rico financial markets to craft a scheme that allowed them to wrongfully garner millions of dollars in fees for the UBS Defendants.  Operating on all sides of mutual fund and bond transactions – as investment advisor, bond underwriter, and mutual fund manager – the UBS Defendants manipulated the Funds and the bond market to the detriment of the Funds and its unsuspecting investors, including Plaintiffs herein and other members of the Class.

3.      The most egregious example of this conflicted and fraudulent dealing centers on Defendants' role in underwriting and trading pension bonds issued by the Employee Retirement System of the Government of Puerto Rico ("the ERS").  The ERS is a statute based, public retirement plan that the government of Puerto Rico maintains for its employees and for the employees of its governmental instrumentalities and Puerto Rican municipalities.    The ERS provides pensions for approximately 278,000 government employees and retirees.

4.      In 2007, UBS Financial became a financial advisor to the ERS.  In the following year, UBS Financial served as underwriter when the ERS sold $2.9 billion in pension bonds (the "ERS Bonds" described more fully below).  These bond offerings resulted in approximately $27 million in fees for UBS Financial and its co-underwriters.

5.      The ERS Bonds were of low quality and rated just one step above junk by Moody's Investors Service, Standard & Poor's and Fitch Ratings.

6.     In total, UBS Trust purchased approximately $1.5 billion of the ERS Bonds (more than half of the total bond offering) for twenty mutual funds it manages through its division named UBS Asset Managers of Puerto Rico ("UBS Asset Managers"), including the Funds. Advisory agreements with each of the Funds (the "Advisory Agreements") provide that UBS Asset Managers is entitled to receive annual investment advisory fees in the amount of .75% of the Funds' average weekly gross assets. Separate contracts with each of the Funds ("Administration Agreements") provide that UBS Trust is entitled to receive annual administrative fees in the amount of .15% of the Funds' average weekly gross assets. The end result is that not only did the UBS Defendants benefit from the initial sale of the ERS Bonds to the Funds, they also derived additional investment and management fees on an ongoing basis from these inappropriate investments.

7.     Over $750 million in purchases of the near-junk ERS Bonds were concentrated in the Funds. The ERS Bond purchases by UBS Trust amounted to approximately 30% of the total holdings of Funds II, III, and IV and approximately 15% of the total holdings of Tax-Free Fund II such that the Funds were overly concentrated in low quality ERS Bonds.

8.     The Funds are a series of UBS closed-end fixed income funds. A closed-end fixed income fund issues a fixed number of shares to raise capital, similar to selling stock through initial public offerings. However, after the initial trading, shares of the Funds are traded through a trading desk at UBS Financial, which is the private, principal secondary market dealer for the Funds. Shares of the Funds do not trade on any public securities exchanges.

9.      Plaintiffs' claims arise from Defendants' material misstatements and fraudulent omissions concerning the nature, purpose, and suitability of the purchases of the ERS Bonds for the Funds and the failure of Defendants to act solely in the best interests of the Funds and shareholders of the Funds, and to exercise the required skill, care, prudence, and diligence in administering the Funds and the Funds' assets between January 24, 2008 and the present (the "Relevant Period" or the "Class Period").

10.      These conflicted transactions would have been expressly prohibited by the Investment Company Act of 1940 for any company registered thereunder. Because they operate exclusively in Puerto Rico, the Funds are exempt from those express requirements. In fact, the UBS Defendants have attempted to exploit that loophole in order to dominate the Puerto Rico market and extract exorbitant and unwarranted fees by forcing its captive investor-Funds to engage in wholly unsuitable transactions. The transactions, however, are no less harmful to the Funds' investors merely as a result of the limited geographical territory of their sale and are prohibited by other provisions of federal and Commonwealth law, as set forth herein.

11.      Defendants, who stood on all sides of the transactions, materially misrepresented and fraudulently omitted vital facts about the ERS Bond issuance and purchases and allowed the imprudent investment of the Funds' assets in over $750 million of these high risk, low grade bonds despite blatant conflicts of interest and in violation of statutory duties.

12.      Defendants' breaches of their statutory duties, material misstatements, and fraudulent omissions concerning the purchase of the ERS Bonds, have caused millions of dollars in principal loss to the Funds (losses which are exacerbated for the Funds'

5

investors as a result of the illiquidity of the market for the Funds, which is in large part controlled by the UBS Defendants, and by the fact that the Funds are highly leveraged), plus additional damages of millions of dollars in unwarranted fees paid to the UBS Defendants, to the detriment of the Funds and the Class herein.

## JURISDICTION AND VENUE

13.     Counts I and II asserted herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

14.     The Defendants used, directly or indirectly, means or instrumentalities of interstate commerce in connection with the manipulative or deceptive devices described in Counts I and II, within the meaning of section 10(b) of the Exchange Act. Specifically, Defendants made extensive use of the telephone, internet, and the mails in preparing the Official Statements for the ERS Bond Offerings; communicating with ERS and other members of the underwriting syndicate; communicating with each other for, among other things, coordinating the manipulative purchases of the ERS Bonds by the captive Funds ahead of sales to the rest of the market for the purpose of inflating demand for the ERS Bonds; using the internet to post the Official Statements circulated in connection with the ERS Bond Offerings; and use of the internet to post misleading statements regarding the Funds' asset values.

15.    Count III asserted herein arises under Section 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77a.  This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C.§ 77v(a) and 28 U.S.C. §1331.

16.    The Defendants used means or instruments of transportation or communication in interstate commerce or of the mails, as contemplated by Section 12(a)(2) of the Securities Act.  Specifically, Defendants made extensive use of the telephone, internet, and the mails to communicate with each other, ERS, other members of the syndicate, and with purchasers of the ERS Bonds for the purpose of preparing and distributing the Official Statements for the ERS Bond Offerings.

17.    Count IV asserted herein arises under the Employee Retirement Income System Act of 1974, as amended ("ERISA").  This Court, therefore, also has subject matter jurisdiction over the subject matter of this action pursuant to ERISA §502(e)(1), 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

18.    This Court has supplemental jurisdiction over the related Commonwealth law claims (Counts V through XI) pursuant to 28 U.S.C.A. § 1367 as the claims arising from said violations arise from the same nucleus of operative facts as Counts I-IV.

19.    This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

20.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, Section 22 of the Securities Act, 15 U.S.C. §77v(a), and 28 U.S.C. §1391(b).  The Funds maintained their headquarters and principal place of business in

this District. Virtually all of the acts and transactions that constitute the violations of law complained of herein occurred in this District.

21. Venue is also proper in this District pursuant to ERISA § 502(e)(2), 28 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this District, and the UBS Defendants have a principal place of business in this District.

22. Moreover, the Funds are headquartered in this District. Allegations contained herein are brought derivatively on behalf of the Funds as Nominal Defendants and Defendants' conduct was purposefully directed at this District. As such, jurisdiction in this District over any non-resident Defendant is reasonable under these circumstances.

## THE PARTIES

### A.    Plaintiffs

23. Plaintiff UDEM PRSSA is a multi-employer welfare plan established in 1981 to provide retirement benefits and severance pay for employees of contributing companies represented by the Union de Empleados de Muelles de Puerto Rico, ILA, Local 1901 (mainly workers employed by shipping and related companies at San Juan's port) and is subject to ERISA. UDEM PRSSA is a stockholder of Funds II, III, and IV. UDEM PRSSA has been a stockholder of Funds II, III, and IV at all material times alleged in this Complaint, and will continue to be a stockholder of Funds II, III, and IV through the conclusion of this litigation.

24. Plaintiff UDEM AP is a welfare plan established for the benefit of employees of the Puerto Rico Port Authority (Autoridad de los Puertos). The plan invests funds in order to provide retirement benefits and severance pay for its members.

UDEM AP is a stockholder of the Funds. UDEM AP has been a stockholder of the Funds at all material times alleged in this Complaint, and will continue to be a stockholder of the Funds through the conclusion of this litigation.

**B.    Nominal Defendants**

25.    Nominal Defendants Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., and Tax-Free Puerto Rico Fund II are corporations organized and existing under the laws of the Commonwealth of Puerto Rico. They are closed-end management investment companies registered under the Puerto Rico Investment Companies Act. They are *not* registered under the Investment Company Act of 1940, pursuant to the statutory exception created by 15 U.S.C. §80a-6(a)(1).

**C.    The UBS Defendants**

26.    Defendant UBS Financial is a subsidiary of UBS Financial Services Inc., which in turn carries accounts as a clearing broker for UBS Financial. UBS Financial is registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer. UBS Financial is incorporated under the laws of the Commonwealth of Puerto Rico and has its principal offices in San Juan, Puerto Rico. Throughout the Relevant Period, UBS Financial derived substantial income from acting as a financial advisor to the ERS and as the underwriter of the approximately $2.9 billion offering of the ERS Bonds in 2008.

27.    Defendant UBS Trust is a trust company incorporated under the laws of the Commonwealth of Puerto Rico and has its principal offices in San Juan, Puerto Rico. UBS Trust is a trust company offering personal and corporate trust services, retirement

9

services, investment consulting services and money management services.  UBS Trust acts as the issuing, paying and transfer agent of the Funds.  UBS Trust is not registered as an investment adviser with the SEC.  UBS Trust manages the assets of the Funds through its UBS Asset Managers division.  Throughout the Relevant Period, UBS Trust derived substantial income from managing the Funds and from acting as investment advisor to certain shareholders of the Funds.

28.     The UBS Defendants are the largest asset managers in Puerto Rico, with over 100 financial advisors and tens of thousands of retail accounts.

29.     UBS Trust and UBS Financial act as alter egos in their financial dealings in Puerto Rico.  As alleged herein, they have substantial overlap in directorships and upper management, and otherwise disregard corporate distinctions in order to conduct their business.  Information regarding the exact relationship between these entities is within the exclusive control of the UBS Defendants and discovery will therefore demonstrate the extent to which these entities act for each other.

## D.     The Director Defendants

30.     Defendant Miguel A. Ferrer ("Ferrer") is Chairman of the Board of Directors and President of each of the Funds.  Until September 2009, Ferrer served as the Chief Executive Officer ("CEO") of UBS Financial and the CEO of UBS Trust.  Ferrer is now reportedly Chairman of an entity known as UBS International & Puerto Rico.

31.     Defendant Carlos V. Ubiñas ("Ubiñas") is Vice Chairman of the Board of Directors and Executive Vice President of each of the Funds.  Ubiñas has served as President of UBS Financial since 2005 and now reportedly serves as CEO of an entity known as UBS International & Puerto Rico.

10

32.     Defendant Stephen C. Roussin ("Roussin") is a Director of each of the Funds and Managing Director of UBS Financial.

33.     Defendant Leslie Highley, Jr. ("Highley") is a Director of each of the Funds, Managing Director and Executive Vice President of UBS Trust, and Senior Vice President of UBS Financial. Highley, acting on behalf of UBS Trust (through its UBS Asset Managers division), has served as Portfolio Manager for Fund II and Fund III since 2004, for Fund IV since 2005, and for Tax-Free Fund II since 2002.

34.     Defendant Mario S. Belaval ("Belaval") is a Director of each of the Funds. Belaval is Vice Chairman of Triple S Management ("Triple S"), the largest managed care company in Puerto Rico. UBS Investment Bank received large fees from acting as co-lead underwriter of Triple S's IPO. In 2006, UBS Financial served as the placement agent for $35 million in notes issued by Triple-S, all of which were purchased by Fund IV and another UBS-affiliated fund. Belaval has also served as a director of numerous other UBS-affiliated funds, including UBS's IRA Select Growth and Income Fund. For the fiscal year ending July 31, 2009, Belaval's aggregate compensation for service on the boards of funds advised or co-advised by UBS Trust was reported to be $137,531 (excluding expenses).

35.     Defendant Agustin Cabrer-Roig ("Cabrer-Roig") is a Director of each of the Funds. Cabrer-Roig also sits on the board of several other UBS funds, including the Puerto Rico Short-Term Investment Fund, Puerto Rico GNMA & U.S. Gov't Target Maturity Fund, and the Puerto Rico AAA Portfolio Bond Fund. For the fiscal year ending July 31, 2009, Cabrer-Roig's aggregate compensation for service on the boards of

11

funds advised or co-advised by UBS Trust was reported to be $101,531 (excluding expenses).

36.     Defendant Gabriel Dolagaray-Balado ("Dolagaray-Balado") is a Director of each of the Funds. Dolagaray-Balado sits on the board of several other UBS funds, including the AAA Portfolio Bond Fund II and Puerto Rico Short Term Investment Fund. For the fiscal year ending July 31, 2009, Dolagaray-Balado's aggregate compensation for service on the boards of funds advised or co-advised by UBS Trust was reported to be $92,031 (excluding expenses).

37.     Defendant Carlos Nido ("Nido") is a Director of each of the Funds. Nido is Vice President of Sales for El Nuevo Día, a leading newspaper in Puerto Rico. Fund III and other UBS-affiliated funds have at times invested in notes issued by El Nuevo Día. Nido sits on the board of several other UBS funds, including the AAA Portfolio Bond Fund II and the Puerto Rico Short Term Investment Fund. For the fiscal year ending July 31, 2009, Nido's aggregate compensation for service on the boards of funds advised or co-advised by UBS Trust was reported to be $92,031 (excluding expenses).

38.     Defendant Luis M. Pellot-González ("Pellot-González") is a Director of each of the Funds. Pellot-González sits on the board of several other UBS funds, including the Puerto Rico Short Term Investment Fund, AAA Portfolio Bond Fund, and Puerto Rico Mortgage Backed and U.S. Government Securities Fund. For the fiscal year ending July 31, 2009, Pellot-González' aggregate compensation for service on the boards of funds advised or co-advised by UBS Trust was reported to be $100,031 (excluding expenses).

39.     Defendant Vicente J. Leon ("Leon") is a Director of each of the Funds. Leon is, along with Belaval, Vice Chairman of Triple-S. In 2006, UBS Financial served as the placement agent for $35 million in notes issued by Triple-S, all of which were purchased by Fund IV and the Puerto Rico AAA Portfolio Target Maturity Fund. Leon also sits on the board of several UBS funds, including the Tax-Free Puerto Rico Fund, Target Maturity Fund, Puerto Rico AAA Portfolio Target Maturity Fund, Portfolio Bond Fund, Portfolio Bond Fund II, Puerto Rico GNMA & U.S. Government Target Maturity Fund, Puerto Rico Mortgage-Backed and U.S. Securities Funds, UBS IRA Selected Growth and Income Fund, Multi-Select Securities Puerto Rico Fund, and the Puerto Rico Short-Term Investment Fund. For the fiscal year ending July 31, 2009, Leon's aggregate compensation for service on the boards of funds advised or co-advised by UBS Trust was reported to be $68,531 (excluding expenses).

40.     Defendant Clotilde Pérez ("Pérez") is a Director of each of the Funds. Pérez also sits on the board of several other UBS funds, including the Multi-Select Securities Puerto Rico Fund.

41.     Defendants Ferrer, Ubiñas, Roussin, Highley, Belaval, Cabrer-Roig, Dolagaray-Balado, Nido, Pellot-González, Leon and Pérez are referred to collectively as the "Director Defendants."

### E.     The Doe Defendants

42.     The true names and capacities of defendants sued herein as Does 1 through 100 are other participants in the conduct alleged herein whose identities have yet to be ascertained. Such unnamed defendants potentially include, but are not limited to: (a) other officers and/or directors who breached their duties to Plaintiffs and/or the Funds

and/or otherwise acted in concert with Defendants; (b) other UBS-affiliated entities who breached their duties to Plaintiffs and/or the Funds and/or otherwise acted in concert with the Defendants; and (c) insurance companies and/or bond companies who provided insurance coverage to Defendants for the acts alleged herein. Plaintiffs will seek to amend this complaint to state the true names and capacities of said unnamed defendants when they have been ascertained.

**FIDUCIARY DUTIES AND OBLIGATIONS OF THE
DIRECTOR DEFENDANTS TO THE FUNDS**

43.     By reason of their positions as directors and/or officers of the Funds, and pursuant to Articles 2.03, 4.03, 4.04, and 4.05 of Act Number 144 of August 10, 1995, as amended, also known as the "General Corporations Act of 1995," each of the Director Defendants owed the Funds the duty to exercise due care and diligence in the management and administration of the Funds. Furthermore, each of the Director Defendants owed the Funds and its shareholders duties of loyalty, good faith and candor, which required them to refrain from engaging in self-interested transactions with the Funds, and to disclose material facts relating to their dealings with the Funds.

44.     The Director Defendants are required to act in good faith, in the best interests of the Funds and with due care, including reasonable inquiry, as would be expected of an ordinarily prudent person. To diligently comply with this duty, the Director Defendants may not take any action that:

a.     adversely affects the value of the Funds;

b.     contractually prohibits them from complying with or carrying out their fiduciary duties;

c.     fails to fully disclose all material information; or

d.      otherwise adversely affects their duty to search and secure the best

value reasonably available under the circumstances.

45.     By virtue of the Director Defendants' positions as officers and directors of

the Funds, the Director Defendants, at all relevant times, had the power to control and

influence, and did control and influence and cause the Funds to engage in the practices

complained of herein.

## DUTIES AND OBLIGATIONS OF THE
## UBS DEFENDANTS TO THE FUNDS

46.     By reason of its position as asset manager and fund advisor for the Funds

(through its UBS Asset Managers Division), UBS Trust and its alter ego UBS Financial

had various contractual obligations to the Funds.  In performing those contractual duties,

the UBS Defendants were required to act in good faith and in a loyal, honest and fair

manner.  This good faith obligation required the UBS Defendants to faithfully comply

with the representations and agreements reached with the Funds and not to defraud or

abuse the trust given to them by the Funds.

47.     By reason of its position as asset manager and fund advisor for the Funds

(through its UBS Asset Managers Division), UBS Trust and its alter ego UBS Financial

acted as Agent ("Mandatario") for the Funds as Principal ("Mandante") and therefore had

a duty to act and perform the services hired in accordance to the instructions of the Funds

and in good faith.  In the absence of instructions, all acts of UBS Trust should have been

exercised according to the standard of conduct of a good father of a family ("buen padre

de familia").

48.     To diligently comply with these duties and obligations, the UBS

Defendants may not take any action that:

15

a.      adversely affects the value of the Funds;

b.      prohibits the officers and directors of the Funds from complying with or carrying out their fiduciary duties;

c.      fails to fully disclose all material information; or

d.      otherwise adversely affects their duty to search and secure the best value reasonably available under the circumstances.

49.      By virtue of the UBS Defendants' positions as advisors and asset managers, the UBS Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause the Funds to engage in the practices complained of herein.

## THE ERS BOND OFFERINGS AND DEFENDANTS' FALSE STATMENTS

50.      In 2008, UBS Financial served as underwriter when the ERS sold $2.9 billion in pension bonds (the ERS Bonds described below), in a series of three bond offerings.  These bond offerings resulted in approximately $27 million in fees for UBS Financial and its co-underwriters.

51.      The ERS Bonds were of low quality and rated just one step above junk by Moody's Investors Service, Standard & Poor's and Fitch Ratings.

52.      In  assigning this low rating to the ERS Bonds, Fitch cited a "very long final maturity" and the "rising debt service profile," noting that "growth [was] needed to generate one times (x) coverage of debt service."  Fitch also took into account the fact that "[t]here is no retirement system asset or commonwealth backstop on bonds, and no claim on employee contributions."

53. Series A of the ERS Bonds was offered in the local Puerto Rico market in late January 2008 and available for delivery shortly thereafter.

54. In the "Official Statement" describing the Series A ERS Bonds, dated January 29, 2008, the underwriters (including UBS Financial) provided the following sentence:

> IN CONNECTION WITH THE OFFERING OF THE SERIES A BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES A BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

55. As discussed herein, however, rather than merely "stabilizing" or "maintaining" the market prices for the ERS Bonds, the UBS Defendants virtually created the market for the Series A ERS Bonds, in the absence of demand from outside investors.

56. Closed-end mutual funds controlled by the UBS Defendants purchased over $600 million of the approximately $1.6 billion Series A offering. The Funds purchased almost $325 million in ERS Bonds from this offering.

57. The Official Statement for the Series A ERS Bonds indicated that a planned Series B of the ERS Bonds was to have been sold outside of the Puerto Rico market. On February 22, 2008, the Government Development Bank of Puerto Rico announced that such a global offering had been suspended, presumably due to lack of demand. To date, such a global offering has not occurred.

58. Instead, a new Series B of the ERS Bonds was offered in the local Puerto Rico market in late May 2008 and available for delivery shortly thereafter.

59. In the "Official Statement" describing the Series B ERS Bonds, dated May 28, 2008, the underwriters (including UBS Financial) provided the following sentence:

> IN CONNECTION WITH THE OFFERING OF THE SERIES B BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES B BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

60. Rather than merely "stabilizing" or "maintaining" the market prices for the ERS Bonds, however, the UBS Defendants again created the market for the Series B ERS Bonds in the absence of outside demand.

61. Closed-end mutual funds controlled by the UBS Defendants purchased over $850 million of the approximately $1 billion Series B offering. The Funds purchased over $430 million in ERS Bonds from this offering.

62. Series C of the ERS Bonds was offered in the local Puerto Rico market in late June 2008 and available for delivery shortly thereafter.

63. In the "Official Statement" describing the Series C ERS Bonds, dated June 26, 2008, the underwriters (including UBS Financial) provided the following sentence:

> IN CONNECTION WITH THE OFFERING OF THE SERIES C BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES C BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

64. As discussed herein, however, rather than merely "stabilizing" or "maintaining" the market prices for the ERS Bonds, the UBS Defendants had virtually created the market.

65.     Closed-end mutual funds controlled by the UBS Defendants purchased $17 million of the approximately $300 million Series C offering.  The Funds purchased nearly $2 million in ERS Bonds from this offering.

## SUBSTANTIVE ALLEGATIONS OF DEFENDANTS' BREACH OF THEIR OBLIGATIONS TO THE FUNDS

66.     Because of the statutory and contractual duties described above, Defendants were required to manage the Funds' investments solely in the interest of the Funds and its shareholders.

67.     These duties require Defendants to avoid conflicts of interest and to resolve them promptly when they occur.  Defendants have failed to act accordingly.

68.     Defendants may not ignore circumstances, such as those here, which increase the risk of loss to shareholders of the Funds to an imprudent and unacceptable level.

69.     The challenged transactions in which Defendants breached their fiduciary and other duties involved the purchase of over $700 million of the ERS Bonds, over 30% of the  total assets of Funds II, III, and IV and approximately 15% of the total assets of Tax-Free Fund II.  The UBS Defendants stood on all sides of these transactions and artificially created demand for the ERS Bonds in order to maximize fees for the UBS Defendants.

70.     Specifically, UBS Financial, who was the financial advisor for ERS, acted as the underwriter for the ERS Bond offerings.  UBS Financial stood to receive large fees when the bond offerings were completed, thus creating a strong financial incentive for Defendants to find purchasers to buy the ERS Bonds.  In fact, UBS

Financial and its co-underwriters reportedly received $27 million in fees from the ERS Bond offerings.

71.     On the other side of the transactions, UBS Trust, who was charged with ensuring that the Funds purchased suitable and appropriate investments, purchased over $750 million of these low grade high risk pension bonds for the Funds that it managed, the shares of which were held or purchased by Plaintiffs and other members of the Class. The UBS Defendants also received millions of dollars in annual fees for managing and administering the Funds (in addition to a hefty 4.75% upfront commission).

72.     These actions created a disabling conflict of interest which caused the UBS Defendants (and the Director Defendants who, as discussed in more detail above and below, were beholden to the UBS Defendants) to breach their fiduciary and other duties to the Funds because Defendants should not provide advice to the bond issuer, underwrite those bonds and then buy the bulk of those bonds for the mutual funds that it manages. These actions were particularly inappropriate under the circumstances present here, where UBS Trust, by purchasing over half of those bonds for mutual funds that it controlled, improperly generated artificial demand for the ERS Bonds to ensure that UBS Financial received its full fees for successfully completing the bond offering.

73.     The obvious conflicts of interest among the UBS Defendants have been noted by Bloomberg News.  For example, in an article titled, *"UBS in Puerto Rico Pension Gets Fee Bonanza Seen as Conflicted,"* Bloomberg News reported:

> "I've never seen such a blatant series of conflicts of interest," says James Cox, professor of law at Duke University School of Law in Durham, North Carolina.
>
> Cox, who has published three books on finance an law, including "Securities Regulation: Cases and Materials" (Aspen Publishers,

2006), says a bank shouldn't provide advice to a bond issuer, underwrite the bonds and buy them for mutual funds that it manages.

\*        \*        \*

"The public wasn't aware they were buying a pig in a poke," Cox says. "This whole thing appears to be engineered by UBS as a way of syndicating bonds without disclosing to the public the very substantial risk of those bonds."

\*        \*        \*

Mercer Bullard, a professor at the University of Mississippi School of Law, says the 1940 law was passed to halt abuses of mutual fund shareholders that he sees being repeated in Puerto Rico.

"These are precisely the kinds of conflicts that led to passing the Investment Company Act," he says. "it's a series of conflicted relationships designed to put money in UBS's pocket at the expense of its clients."

74.    These disabling conflicts of interest put the Defendants in the position of having to choose between their own financial interests, and the interests of the Funds.

75.    In this case, Defendants placed their own interests ahead of the interests of the Funds, to the detriment of the Funds and investors in the Funds.

76.    Defendants used the Funds as a dumping ground for the toxic pension bonds underwritten by UBS Financial in order to maximize the ERS Bonds' offering price and the UBS Defendants' fees, thereby breaching their fiduciary and other duties to the Funds and their shareholders.

77.    In the year following their issuance, the ERS Bonds reportedly lost approximately ten percent of their value. The actual losses suffered by the Funds likely far exceed this amount and include the fees wrongfully extracted from the Funds by UBS Trust.

78. Defendants did nothing to protect the Funds from the inevitable losses the Funds would suffer, or the exorbitant fees incurred by the Funds, as a result of their purchases of the ERS Bonds.

79. While the Defendants enriched themselves with lucrative fees, they ignored their duties to the Funds and the blatant conflicts of interest connected with the ERS Bonds.

## DEFENDANTS FAILED TO DISCLOSE MATERIAL FACTS

80. As a result of Defendants' fiduciary and other obligations to the Funds, they had a duty to disclose all material information concerning the ERS Bonds to the Funds.

81. Defendants had such a duty, but failed to disclose to the Funds the following material facts, as alleged herein: (a) that demand for the ERS Bonds was falsely created by UBS Trust's massive purchases of the ERS Bonds for the Funds and other mutual funds managed and controlled by UBS; (b) that the ERS Bonds were severely overpriced as a result of the false demand created by the UBS Defendants' manipulation of the market on a massive scale; (c) that the ERS Bonds were not suitable for purchase by the Funds, particularly in light of the closed-end nature of the Funds and the stated goal of the Funds to create dividend income; and (d) that the stated asset values published for the Funds were overstated, in large part due to the overvaluation of the ERS Bonds.

82. Throughout the Relevant Period, the Funds justifiably expected the Defendants, who were fiduciaries of and/or had contractual obligations to the Funds, to disclose material information as required by law. The Funds would not have purchased the ERS Bonds if Defendants had disclosed all material information then known to them,

as detailed herein. Thus, reliance by the Funds should be presumed with respect to the Defendants' omissions.

83.     Because of their positions, each of the Defendants had access to adverse undisclosed information about the ERS Bonds' business prospects, financial condition, suitability and performance as particularized herein, and knew (or recklessly disregarded) that these adverse facts had not been disclosed in such a manner that the Funds could make an informed decision concerning the purchase of the ERS Bonds.

## DEFENDANTS' MARKET MANIPULATION ACTIVITIES

84.     As alleged above, throughout the Relevant Period the UBS Defendants were an unusually pervasive force in Puerto Rico's financial markets. Approximately 50% of the brokerage licenses in Puerto Rico are held by employees of the UBS Defendants. The UBS Defendants utilized this substantial market force improperly and manipulated the market for the ERS Bonds to the detriment of the Funds.

85.     At its essence, the manipulative scheme was simple – the UBS Defendants controlled the buyers and the sellers (and collected fees from both of them). UBS Financial advised ERS to issue the ERS Bonds and then, despite the fact that the mainland bond market had all but collapsed by the time of the offering in 2008, quickly managed to place the majority of the ERS Bonds with buyers, such as the Funds, controlled by UBS Trust. Because the UBS Defendants created such false demand for the ERS Bonds, the Government Development Bank for Puerto Rico was able to quickly tout the ERS Bond issuance as a success (even before the bonds were actually delivered), claiming that "[t]he market showed a big appetite for this bond issue, and this display of confidence by local investors opens the door for us to float a second pension obligation

bond issue in the local markets in the future." In fact, the market did not have an "appetite" for the ERS Bonds, it was simply the UBS Defendants who had an "appetite" for its own cooking.

86. By dominating trading in the ERS Bonds and absorbing the majority of the issuance into its own inventory ahead of any release to the rest of market, the UBS Defendants were able to falsely validate and maintain the ERS Bonds' inflated offering price, thus defrauding the Funds and causing them to overstate their asset values. Moreover, because the UBS Defendants used the Funds as a conduit for repurchases of the ERS Bonds, they were able to conceal from investors the fact that the UBS Defendants were the main source of demand for the ERS Bonds. In so doing, the UBS Defendants engaged in market activity aimed at deceiving investors as to how other market participants have valued a security, thereby sending false pricing signals to the market.

87. Although the ERS Bond offerings were not subject to the requirements of SEC Regulation M (relating to affiliated purchasers of the issuer), reference to that regulation by way of analogy clearly demonstrates the UBS Defendants' trading activity was outside the natural interplay of supply and demand and that its high volume trading was designed to create a false impression of supply and demand for the security. Regulation M is a prophylactic regulation aimed at preventing manipulation in the context of distributions, and Rule 101 thereof governs when and how offers and purchases can be made by underwriters and others participating in a distribution. Rule 101 prohibits an underwriter from purchasing the securities being offered for almost the entire period that underwriter participates in the distribution. Here, the UBS Defendants

were far and away the *largest* purchaser of the securities they were underwriting during the distribution. Moreover, even after the underwriter ceases to participate in the distribution, its ability to purchase the offered securities for purposes of stabilizing the market price are greatly restricted. In particular, it may only engage in stabilization for the purpose of "preventing or retarding a decline in the market price of a security." Here, the UBS Defendants engaged in massive repurchases of the ERS bonds, not to prevent or retard a decline in market price, but, instead, to *create* a market out of thin air. Thus, the UBS Defendants' trading activities constitute conduct that the SEC has determined is presumptively manipulative.

88.     The Funds relied to their detriment on the price of ERS Bonds when they purchased them from the UBS Defendants. As a result of the UBS Defendants' manipulative conduct, the price of the ERS Bonds was greatly inflated. Had the market been allowed to value the ERS Bonds, as Professor Cox observed, the price would have been informed by the substantial risk of those bonds. Instead, as a result of Defendants' manipulative activity, the Funds paid highly inflated prices for the ERS Bonds.

89.     At all relevant times, the UBS Defendants knew that, as a result of their conduct, the price of the ERS Bonds would be artificially inflated relative to the known lack of demand for these securities underwritten by UBS Financial. Alternatively, the UBS Defendants recklessly disregarded the propensity of their conduct to manipulate the price of the ERS Bonds.

90.     Indeed, the UBS Defendants' conduct in connection with the Series B Offering is particularly illustrative of the UBS Defendants' state of mind. Even though global bond markets were collapsing and UBS Financial had to abandon a planned U.S.

offering of the Series B ERS Bonds for lack of any investor demand for the bonds, the UBS Defendants actually *increased* the Funds' position in the ERS Bonds by purchasing approximately *85%* of the entire Series B issuance on behalf of closed-end funds controlled by UBS. Thus, despite the UBS Defendants' knowledge of the lack of demand for the ERS Bonds and the fact that the ERS Bonds were unsuitable for a registered public offering in the U.S., it nevertheless decided that Funds ought to buy much, much more of them. The only inference that can be drawn from such conduct is that the UBS Defendants had something other than the Funds' best interests in mind when trading on their behalf. Rather, it is precisely because the market's appetite for bonds was turning against the UBS Defendants and its planned syndication that the UBS Defendants had to significantly increase the scope and extent of the manipulative trading vis-à-vis the captive Funds in order to successfully prop up the price of the ERS Bonds.

## LOSS CAUSATION

91.     Throughout the Relevant Period, the price of the ERS Bonds was artificially inflated as a result of Defendants' material misrepresentations, omissions, and market manipulation. The true value of the ERS Bonds during the Relevant Period was far less than the value that was advocated by the UBS Defendants upon their issuance and published by the UBS Defendants thereafter. The UBS Defendants have at all times had an incentive to artificially inflate the stated value of the ERS Bonds in order to obtain exorbitant fees both in the underwriting of the ERS Bonds and in the management fees it charged the Funds for those "assets."

92.     As the true value of the ERS Bonds and the scope of UBS' self-dealing was revealed, the ERS Bond prices declined, causing harm to the Funds. While some of

that decline is reflected in the values assigned to the ERS Bonds by UBS, which controls the market for the ERS Bonds, those values are not a reliable indicator of the ERS Bonds' true value, given UBS's incentive to inflate those values for its own gain.

93.     The declines in the value of the ERS Bonds, and the resulting damages suffered (including the exorbitant fees charged by UBS), are directly attributable to the Defendants' misrepresentations and omissions. Had the Funds known of the material adverse information not disclosed by the Defendants named herein, or been aware of the truth behind the Defendants' material misstatements, they would not have purchased the ERS Bonds nor paid the inflated fees associated therewith.

## DERIVATIVE ACTION ALLEGATIONS

94.     Plaintiffs bring this action derivatively on behalf of and for the benefit of the Funds to redress injuries suffered, and yet to be suffered, by the Funds as a direct and proximate result of the breaches of fiduciary duty and other legal violations alleged herein. The Funds are named as nominal defendants in a derivative capacity.

95.     Plaintiff UDEM PRSSA is a shareholder of Funds II, III, and IV and will adequately and fairly represent the interests of Funds II, III, and IV and their shareholders in this litigation and have retained counsel competent and experienced in securities litigation and stockholder derivative actions.

96.     Plaintiff UDEM AP is a shareholder of each of the Funds and will adequately and fairly represent the interests of each of the Funds and their shareholders in this litigation and have retained counsel competent and experienced in securities litigation and stockholder derivative actions.

97.     Plaintiffs intend to retain their respective shares in the Funds throughout the duration of this litigation.

98.     Plaintiff UDEM PRSSA was a shareholder of Funds II, III, and IV at the time of the relevant transactions alleged herein and has continued to hold shares of Funds II, III and IV since that time.

99.     Plaintiff UDEM AP was a shareholder of each of the Funds at the time of the relevant transactions alleged herein and has continued to hold shares of each of the Funds since that time.

100.    The wrongful acts complained of herein subject, and will persist in subjecting, the Funds to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

101.    The wrongful actions complained of herein were unlawfully concealed from the Funds' shareholders.

## DEMAND IS EXCUSED

### A. Demand is Excused Because the Subject Transactions Were Not the Product of a Valid Exercise of Business Judgment.

102.    All claims asserted derivatively on behalf of the Funds challenge a business decision or decisions of the Funds' boards. Specifically, all claims asserted derivatively challenge the Funds' boards' decisions to purchase ERS Bonds on behalf of the Funds.

*The ERS Bond Purchases Were Interested-Director Transactions that Were Not Entirely Fair and Were, Therefore, Not the Product of Valid Business Judgment.*

103.    Demand on the Funds' boards of directors (all of which are identical and consist solely of the Director Defendants) is excused because the facts set forth in this

28

Complaint create a reasonable doubt that the purchase of the ERS Bonds (and the associated payment of fees to UBS) was the product of valid business judgment.

104. As alleged herein, the Director Defendants were participants in a scheme to manipulate the price of the ERS Bonds purchased by the Funds in order to benefit the UBS Defendants and their investment banking client ERS and to artificially inflate the management and other fees payable to the UBS Defendants.

105. As a consequence of this scheme, the Director Defendants stood to receive, and did receive, significant personal benefits not shared equally by the Funds' shareholders. These benefits include additional compensation received either as a direct consequence of the increase in the Funds' management fees attributable to the scheme, additional opportunities to serve as directors of other UBS-affiliated investment funds, and opportunities to use UBS captive funds to support their other business enterprises.

106. As a result of this financial interest, the Director Defendants bear the burden of proving the entire fairness of the ERS Bond purchases by the Funds. Because the entire fairness doctrine applies, the business judgment rule is rebutted and demand is therefore excused.

107. Because the Director Defendants stood to receive financial benefits not shared by the shareholders generally, the ERS Bond Transactions constitute interested-director transactions. As interested-director transactions that were not entirely fair to the Funds, the Director Defendants' negotiation, consummation, and ratification of the ERS Bond purchases and related transactions constitutes a breach of their duties of loyalty to the Funds and their shareholders.

108.     As alleged herein, the transactions were not entirely fair because the Funds did not receive a fair price in the transactions and there was no process employed to ensure fairness to the Funds.  Instead the Director Defendants, in concert with the UBS Defendants, forced the Funds to pay inflated prices for the ERS Bonds in order to benefit themselves and ERS, an important UBS investment banking client, at the Funds' and the shareholders' expense.  Moreover, the timing, structure, and negotiation of, as well as disclosures concerning, the transactions fail  that the Funds were not treated fairly.

109.     Because there is reason to doubt that the ERS Bond transactions were consummated at a fair price and was the product of fair dealing, there is reason to doubt that the transactions were entirely fair and therefore reason to doubt that the Director Defendants' acts in furtherance of these interested transactions comport with their duties of loyalty and were the product of valid business judgment.  Because there is reason to doubt that the transactions are the product of valid business judgment, demand is excused.

*The ERS Bond Transactions Were not Undertaken in Good Faith and,
Therefore, Were Not the Product of Valid Business Judgment.*

110.     Because the ERS Bond purchases were undertaken for a purpose other than a genuine attempt to advance the Funds' welfare, the transactions were not undertaken in good faith.  Where directors fail to act in good faith, their duties of loyalty are violated.  Because the Director Defendants' duties of loyalty were implicated with regard to the ERS Bond Transactions, there is reason to doubt that the transactions were the product of valid business judgment.

111.     Moreover, because the Director Defendants, in consummating the ERS Bond purchases, consciously disregarded their known duty to act in the best interests of

30

the Funds, the transactions were not undertaken in good faith. As alleged herein, the Director Defendants knowingly participated in a scheme to inflate the price of the ERS Bonds, causing the Funds to overpay for the ERS Bonds and to cause misstatements of their value. Thus, in regards to the ERS Bond purchases, the Director Defendants knowingly and completely failed to attempt to fulfill their duties to advance the Funds' welfare, and there is reason to doubt that the Transactions were the product of valid business judgment, demand is excused.

*The Director Defendants did not Exercise Due Care in Consummating the ERS Bond Transactions and, Therefore, Demand is Excused.*

112. The Director Defendants did not adequately inform themselves about the details of and the circumstances surrounding the ERS Bond Transactions, including: (a) the true value of the ERS Bonds; (b) the UBS Defendants' motive in pushing the bulk of the distribution onto its captive affiliates; (c) the advisability of assuming so large a position in the ERS Bonds; and (d) the suitability of the investment for the Funds. At a minimum, these circumstances indicate that the Director Defendants' approval of the Funds' purchases of the ERS Bonds were grossly negligent and creates a reason to doubt that the underlying transactions were the product of valid business judgment. Demand is therefore excused.

**B. Demand is Excused Because a Majority of the Funds' Directors are Not Independent**

113. To the extent that any of the derivative claims asserted in this Complaint do not challenge a business decision or decisions of the boards of directors of the Funds, demand is excused because the facts alleged in this Complaint create a reasonable doubt

31

that a majority of the Director Defendants are independent and could impartially consider a demand at the time the complaint was filed.

114. A reasonable doubt exists that the inside directors, Defendants Ferrer, Ubiñas, Roussin, and Highley, are independent, and would have been able to impartially consider a demand at the time this Complaint was filed. As highly placed officers of UBS Financial, UBS Trust, or, in Ferrer's case, of both, these defendants were direct beneficiaries of the fraud worked on the Funds. Those defendants who were officers of UBS Trust benefitted from the Funds' payment of inflated management fees. Similarly, those defendants who were officers of UBS Financial benefitted from the manipulative conduct engaged in by the UBS Defendants in connection with the distribution of the ERS Bonds. The benefits received by these defendants as a consequence of their participation in the fraud and their relationships with the UBS Defendants are both pecuniary and reputational in nature.

115. Moreover, each of the outside directors of the Funds, Defendants Belaval, Cabrer-Roig, Nido, Leon, Pérez, Dolagaray-Balado, and Pellot-González, are beholden to the inside directors or so under their influence that their discretion would be sterilized. Each of the "outside" directors acts as a director for numerous other UBS-affiliated investment funds. Thus, each "outside" director depends on the UBS Defendants for substantial remuneration in addition to the director fees received for services rendered to the Funds.

116. Defendants Belaval, Dolagaray-Balado and Nido are or were directors of every fund that has retained UBS Trust as an advisor or co-advisor. In total, these defendants sit on the boards of at least 26 UBS-affiliated funds. The remaining outside

directors serve on the boards of every fund that has retained UBS Trust to be its sole advisor. In total, these defendants sit on the boards of at least 17 UBS-affiliated funds.

117.    From their part-time jobs as directors for the UBS-affiliated funds, all but one of the outside directors reportedly receive, on average, yearly compensation at a rate approximately four times the median household income in Puerto Rico.

118.    These directors' dependence on the UBS Defendants for substantial remuneration apart from the compensation received for serving as a director of the Funds makes these directors beholden to the inside directors.

119.    Additionally, Defendants Belaval, Nido and Leon had previously benefited from using UBS-affiliated funds as vehicles to support investments in their other business enterprises and therefore have reason to discourage scrutiny of any similar related-party transactions, such as the purchase of the ERS Bonds.

120.    In light of the foregoing, demand is excused.

## CLASS ACTION ALLEGATIONS

121.    **Class Definition.** This action is brought by Plaintiffs, for themselves and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3). The proposed class is defined as follows:

> All shareholders in Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., and Tax-Free Puerto Rico Fund II, Inc. (the "Funds") between January 24, 2008 and the present. Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any of them.

122.    **Subclass.** Appropriate for treatment in a subclass are the ERISA-based claims for breach of fiduciary duty brought by those members of the Class, including UDEM PRSSA, whose investment was made through an ERISA qualified plan.

33

123. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class. Each of the Funds has issued over 45 million shares and it is reasonable to assume, therefore, that there are (at a minimum) thousands of distinct shareholders in each Fund. The exact number is within the knowledge of the Defendants.

124. **Commonality.** There are common questions of law and fact in this class action that relate to and affect the rights of each member of the Class including:

a. Whether Defendants owed a fiduciary or other duty to Plaintiffs and members of the Class, under statutory and/or other law, including a duty of loyalty, a duty of candor, a duty of fair dealing, a duty to avoid self-dealing, a duty of good faith, and an affirmative duty to act in the interests of Plaintiffs and the Class, rather than in Defendants' own interests;

b. Whether Defendants breached their fiduciary and other duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of Plaintiffs and the Class;

c. Whether Defendants are liable to Plaintiffs and members of the Class for damages they suffered due to breach of fiduciary and other duties;

d. Whether Defendants are liable to Plaintiffs and other members of the Class for the amounts in which Defendants have been unjustly enriched by their breaches of fiduciary and other duties;

34

e.      Whether a constructive trust exists in favor of Plaintiffs with respect to the fees improperly obtained by Defendants as a result of their breaches of fiduciary duty;

f.      Whether the Plaintiffs and members of the Class are entitled to a reasonable award of attorneys' fees, interest and costs of suit.

125.    **Typicality.**  The claims of Plaintiffs are typical of the claims of all Class members.  Plaintiffs are situated identically to all members of the Class with respect to the prevailing issues presented in this case.  The claims of Plaintiffs are based on the same fundamental allegation and legal theories as the claims of all other members of the class.

126.    **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

127.    **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it virtually impossible for members of the Class to individually redress the wrongs done to them by Defendants.  There will be no difficulty in the management of this action as a class action.

## OBLIGATIONS OF THE UBS DEFENDANTS
## TO PLAINTIFF UDEM AP AND THE CLASS

128.    By reason of their sale of shares of the Funds to members of the Class and their position as asset manager and fund advisor for the Funds, the UBS Defendants had

various contractual obligations to the Funds. In performing those contractual duties, the UBS Defendants were required to act in good faith and in a loyal, honest and fair manner. This good faith obligation required the UBS Defendants to faithfully comply with the representations and agreements reached with the Plaintiff and the Class and not to defraud or abuse the trust given to them Plaintiff and the Class.

129.    The UBS Defendants are required to act in good faith, in the best interests of the Fund's shareholders. To diligently comply with this duty, the Defendants may not take any action that:

        a.    adversely affects the value provided to the Class;

        b.    fails to fully disclose all material information; or

        c.    otherwise adversely affects their duty to search and secure the best

value reasonably available under the circumstances for the members of the Class.

## ERISA FIDUCIARY DUTIES OF THE DEFENDANTS TO PLAINTIFF UDEM PRSSA AND THE CLASS

130.    Defendants are fiduciaries of any ERISA plans that invested in the Funds, including Plaintiff UDEM PRSSA, pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109, and 1132.

131.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions. *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A). Such fiduciaries are referred to herein as "*de facto*" or "functional" fiduciaries. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or

indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.*

132.   Here, to the extent that Funds II, III, and IV held and controlled ERISA monies invested in Funds II, III, and IV, each of the Defendants owed fiduciary duties to the participants and beneficiaries of the ERISA plans in the manner and to the extent set forth under ERISA.

133.   As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer Funds II, III, and IV and the investments of Funds II, III, and IV solely in the interest of the ERISA plan's participants and beneficiaries.

134.   Consequently, in light of the foregoing duties, responsibilities, and actions, Defendants were *de facto* fiduciaries of ERISA plan Class members, including UDEM PRSSA, within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that the Defendants exercised discretionary authority or discretionary control respecting management of ERISA monies in Funds II, III, and IV, exercised authority or control respecting management or disposition of the assets of Funds II, III, and IV, and/or had discretionary authority or discretionary responsibility in the administration of the ERISA monies in Funds II, III, and IV.

## SUBSTANTIVE ALLEGATIONS OF DEFENDANTS' BREACH OF FIDUCIARY AND OTHER DUTIES TO THE CLASS

135.   During the Class Period, as fiduciaries of the Class members under ERISA and with obligations to act in good faith under Commonwealth law, Defendants were required to manage the Funds' investments solely in the interest of the shareholders of the

Funds, and for the exclusive purpose of providing benefits to the participants, beneficiaries and shareholders. These duties require Defendants to avoid conflicts of interest and to resolve them promptly when they occur. Defendants have failed to act accordingly.

136. Moreover, Defendants could not ignore circumstances, such as those here, which increase the risk of loss to shareholders of the Funds to an imprudent and unacceptable level.

137. The same breaches of fiduciary and other duties to the Funds alleged above, were also breaches of duty to the Class, and constituted a clear conflict of interest given the UBS Defendants' position on all sides of the transactions.

138. In one year, the ERS Bonds lost approximately ten percent of their value. The actual losses suffered by the Class likely far exceed this amount, in part as a result of the limited market for the Funds and their closed-end nature, and also as a result of fees wrongfully extracted by the UBS Defendants.

139. Defendants did nothing to protect Plaintiffs and the Class as shareholders of the Funds from the inevitable losses the Funds would suffer or the exorbitant fees extracted from the UBS Defendants acting on all sides of the transaction.

## COUNT I

### Derivative Claim For Violation Of Section 10(b) Of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against the UBS Defendants)

140. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

141. Throughout the Relevant Period, the UBS Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate

commerce and/or of the mails, including postings on UBS's website, engaged and participated in a continuous course of conduct designed to create a market for ERS Bonds and artificially inflate the value of the ERS Bonds in order to extract unearned fees.

142.   The UBS Defendants employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of conduct that included the omission of material facts that Defendants had a duty to disclose to the Funds.  The UBS Defendants also participated in a fraudulent scheme and artifice to defraud that included looting of the Funds by, among other things, causing the Funds to purchase ERS Bonds to maintain a market for those bonds and to benefit the UBS Defendants, who stood to gain from underwriting and other fees related to the ERS Bond issuance, at the expense of the Funds and its shareholders.

143.   The UBS Defendants are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority, each of the UBS Defendants was able to and did control the conduct complained of herein.

144.   The UBS Defendants acted with scienter throughout the Relevant Period in that they either had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain the true facts, even though such facts were available to them.  The UBS Defendants were affirmatively obligated to disclose material information to the funds.  The UBS Defendants are therefore liable under section 10(b) and Rule 10b-5 for any omissions alleged herein, even if disclosure of the omitted information was not necessary to make an existing statement not misleading.

145. The UBS Defendants participated in a scheme to defraud with the purpose and effect of defrauding the Funds. The UBS Defendants caused the Funds to purchase at least $700 million in ERS Bonds that the Funds would not have purchased had they been aware of the UBS Defendants' omissions concerning the reasons for purchasing the ERS Bonds on the Funds' behalf - to wit, propping up an investment banking client's bond offering and inflating their management fees. Moreover, the UBS Defendants caused the Funds to purchase the ERS Bonds at artificially inflated prices knowing that only the UBS Defendants' creation of a market for these shares, through dissemination to captive closed-end funds, would further maintain the artificial inflation at a time that the UBS Defendants were themselves profiting by reaping fees on all sides of the ERS Bond transactions.

146. As described herein, the UBS Defendants made the omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon the Funds during the Relevant Period.

147. The purchase of the ERS Bonds caused the Funds economic loss, both in the value of the ERS Bonds and the associated fees related thereto.

148. The decline in the value of the ERS Bonds, and the resulting damages suffered (including the exorbitant fees charged by UBS), were directly attributable to the UBS Defendants' omissions. Had the Funds known of the material adverse information not disclosed by UBS Defendants, or been aware of the truth behind the UBS Defendants' material misstatements, they would not have purchased the ERS Bonds nor paid the inflated fees associated therewith.

149. By virtue of the foregoing, the UBS Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and caused the Funds to sustain damages, as alleged herein. Total damages incurred are at least tens of millions of dollars, and likely substantially higher.

**COUNT II**

**Derivative Claim For Violation Of Section 20(a) Of the Exchange Act
(Against Individual Defendants Ferrer, Ubiñas, Roussin, and Highley)**

150. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

151. Individual Defendants Ferrer, Ubiñas, Roussin, and Highley ("Inside Director Defendants") acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as alleged herein. By virtue of their positions as officers and/or directors of the UBS Financial and/or UBS Trust, their high-level positions, and participation in and/or awareness of the UBS Defendants' operations, the Inside Director Defendants had the power to influence and control and did influence and control, directly or indirectly, the content and dissemination of the omitted information and had the ability to communicate the correct information to the Funds.

152. In particular, each of the Inside Director Defendants had direct involvement in or intimate knowledge of the day-to-day operations of the UBS Defendants during the Relevant Period. Therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised (or could have exercised) the same.

153. By reason of such wrongful conduct, the Inside Director Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of

the wrongful conduct, the Funds suffered damages in connection with their purchases of the ERS Bonds during the Relevant Period. Total damages incurred are at least tens of millions of dollars, and likely substantially higher.

## COUNT III

### Derivative Claim For Violation of Section 12(a)(2) of the Securities Act (Against the UBS Defendants)

154. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein. Plaintiffs assert this claim pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2) derivatively on behalf of the Funds against the UBS Defendants.

155. The Official Statements distributed in connection with the Series A, B, and C ERS Bond offerings each qualify as a "prospectus" as that term is defined in section 2(a)(10) of the Securities Act.

156. The Official Statements describe "public offerings" of securities by an issuer.

157. The Official Statement distributed in connection with the Series A ERS Bond offering is dated January 29, 2008. According to the Official Statement, the underwriters "provided the following sentence for inclusion in" the Official Statement:

> IN CONNECTION WITH THE OFFERING OF THE SERIES A BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES A BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

158. The above-quoted language is false and misleading in that it fails to disclose that UBS' trading activities would far exceed mere price stabilization or

maintenance. Instead, UBS, by repurchasing the ERS Bonds through their captive Funds, intended to, and did, create the market for the ERS Bonds. The omitted fact is material in that, had it been included in the Official Statement, it would have significantly altered the total mix of information made available to investors.

159. At the time the Official Statement was promulgated, January 29, 2008, the UBS Defendants had *already* engaged in the manipulative trading described above. Therefore, UBS knew the statement was false and misleading as a matter of historical fact. The UBS Defendants did not exercise, and could not have exercised, due diligence with respect to this false and misleading statement.

160. The Official Statements distributed in connection with the Series B and C offerings contain language identical to that cited with reference to the Series A Official Statement above. In the context of those offerings, the UBS Defendants fully anticipated and expected to employ the same trading scheme they had so successfully employed in the Series A Offering. Indeed, because the bond market had worsened, and because UBS had abandoned its plans to offer the Series B Bonds in U.S. markets, UBS had to dramatically increase the scope and extent of its manipulative trading in order to prop up the price of the Series B and C ERS Bonds. As alleged above, it did this by purchasing approximately 85 percent of the Series B issuance on behalf of the captive Funds. Consequently, the UBS Defendants did not exercise, and could not have exercised, due diligence with respect to these false and misleading statements in the Series B and C Official Statements.

161. The Funds sustained damages as a result of the UBS Defendants' violations of Section 12(a)(2) alleged herein.

162.    The UBS Defendants are statutory "sellers" within the meaning of section 12(a)(2) of the Securities Act in that they offered and sold the Bonds for value, or they solicited the purchase, "motivated at least in part by a desire to serve their own financial interests or those of the securities owner." UBS Financial, as underwriters of the Bond Offerings, offered the securities for sale. UBS Trust, as advisor to the Funds, urged the Funds to purchase the Bonds, motivated at least in part by a desire to serve both its own interests and the interests of ERS.

163.    To the extent that the Funds continue to own Series A, B, or C ERS Bonds, they hereby tender those shares to the UBS Defendants and seek rescission of their purchases.

## COUNT IV

### Class Claims For Breach of ERISA Fiduciary Duties
### (Against the UBS Defendants)

164.    Plaintiff UDEM PRSSA incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.    This Count alleges fiduciary breach against the Defendants.

166.    UBS Trust is a *de facto* fiduciary within the meaning of 29 U.S.C. § 1002(21)(A), in part, because UBS Trust rendered investment advice for a fee, direct or indirect, with respect to plan property or had the authority or responsibility to do so. As the alter ego of UBS Trust, or because of enterprise liability, or both, UBS Financial is also a *de facto* fiduciary of Funds II, III, and IV. Therefore, the UBS Defendants were both bound by the duties of loyalty, exclusive purpose and prudence.

167.    Each of the UBS Defendants was a co-fiduciary of Funds II, III, and IV under ERISA § 405, 29 U.S.C. § 1105. As co-fiduciaries, each of the UBS Defendants is

liable for the other's misconduct under the terms of ERISA § 405(a), 29 U.S.C. § 1005(a).

168.    As alleged above, the scope of the fiduciary duties and responsibilities of the UBS Defendants included managing the assets of the Funds for the sole and exclusive benefit of the shareholders of Funds II, III, and IV, and with the care, skill, diligence, and prudence required by ERISA.

169.    Yet, contrary to their duties and obligations to the shareholders of Funds II, III, and IV, the Defendants failed to loyally and prudently manage the assets of Funds II, III, and IV.  Specifically, during the Class Period, the UBS Defendants knew or should have know that the ERS Bonds were not a suitable and appropriate investment for Funds II, III, and IV (particularly in light of the captive and closed-end nature of Funds II, III, and IV and the high percentage of the assets of Funds II, III, and IV to be invested therein) but were, instead, a highly risky investment.

170.    The UBS Defendants' decisions respecting the investment of Funds II, III, and IV in the ERS Bonds described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.  Specifically, based on the above, a prudent fiduciary could not have reasonably believed that the investments by Funds II, III, and IV in the ERS Bonds was how a prudent fiduciary would operate.

171.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special

efforts to assure that their decision making process is untainted by the conflict and made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

172.    As a consequence of the UBS Defendants' breaches of fiduciary duty alleged in this Count, Funds II, III, and IV suffered tremendous losses.  If the UBS Defendants had discharged their fiduciary duties to prudently invest the  assets of Funds II, III, and IV, the losses suffered by Funds II, III, and IV would have been minimized or avoided.

173.    Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, Plaintiff UDEM PRSSA and the other Class members, lost millions of dollars.

**COUNT V**

**Derivative Claim**
**For Unjust Enrichment/Constructive Trust**
**(Against All Defendants)**

174.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

175.    Defendants, and each of them, have been unjustly enriched through a self-dealing scheme aimed at enriching themselves at the expense of the Funds.

176.    Defendants, and each of them, received fees or other remuneration from the Funds, directly or indirectly, by breach of fiduciary duty, violation of trust, and other wrongful acts.

177.    Such fees or other remuneration has been wrongfully retained by Defendants for their personal benefit at the expense of the Funds.

178. As a result of Defendants' unjust enrichment, the Funds have suffered and continue to suffer damages totaling millions of dollars.

179. In addition, as a result of Defendants' wrongful conduct, the Funds sustained and suffered further unconscionable injuries which, with the fees or other remuneration received by Defendants, totaling, at a minimum, tens of millions of dollars.

180. The Funds are entitled to the imposition of a constructive trust over all funds constituting the excessive fees and other remuneration paid to Defendants for their faulty and conflict-ridden advice, and Defendants, and each of them jointly and severally, are subject to the equitable duty to convey such excessive compensation back to the Funds.

181. Plaintiffs and the Funds have no adequate remedy at law.

## COUNT VI

### Class Claims For Violations of Duty to Act in Good Faith
### (Against The UBS Defendants)

182. Plaintiff UDEM AP incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183. Article 1258 of the Civil Code provides that contracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law. The Supreme Court of the Commonwealth of Puerto Rico has stated and reiterated that any contract and agreement must have as its foundation principles of good faith and fair dealing in the trade. Requiring good faith in the conduct and actions of all parties is a governing principle in all legal activity and consist in acting in a loyal, honest and fair

manner. It assumes faithful compliance with the representations and agreements reached and that a party will not defraud or abuse the trust given by the other. Good faith is a source of duties and conduct that can be demanded in each case in accordance to the nature of the legal relationship and the purpose or objective pursued by the parties through it.

184.     The actions and conduct of the UBS Defendants throughout the Class Period clearly and expressly demonstrate a lack and complete absence of any basic good faith principles or compliance with fair dealing standards in fulfilling their contractual obligations to Plaintiff UDEM AP and the Class, including the contractual obligations arising from Plaintiff UDEM AP and the Class' investments in the Funds.   To the contrary, the conduct, actions and dealings of Defendants clearly show complete and absolute bad faith and disregard, not only of the applicable laws and regulations, but of basic principles of fair and honest dealings. This conduct in bad faith has caused damages to Plaintiffs.  Total damages incurred are at least tens of millions of dollars, and likely substantially higher.  Defendants are jointly and severally liable for all damages, losses and injuries caused thereby.

## COUNT VII

### Derivative Claims For Violations of Duty to Act in Good Faith (Against All Defendants)

185.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

186.     Article 1258 of the Civil Code provides that contracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which,

48

according to their character, are in accordance with good faith, use, and law. The Supreme Court of the Commonwealth of Puerto Rico has stated and reiterated that any contract and agreement must have as its foundation principles of good faith and fair dealing in the trade. Requiring good faith in the conduct and actions of all parties is a governing principle in all legal activity and consist in acting in a loyal, honest and fair manner. It assumes faithful compliance with the representations and agreements reached and that a party will not defraud or abuse the trust given by the other. Good faith is a source of duties and conduct that can be demanded in each case in accordance to the nature of the legal relationship and the purpose or objective pursued by the parties through it.

187.    The actions and conduct of Defendants throughout the Relevant Period clearly and expressly demonstrates a lack and complete absence of any basic good faith principles or compliance with fair dealing standards in fulfilling their contractual obligations to the Funds, including the obligations arising out of the Advisory Agreements and the Administrative Agreements. To the contrary, the conduct, actions and dealings of Defendants clearly show complete and absolute bad faith and disregard, not only of the applicable laws and regulations, but of basic principles of fair and honest dealings. This conduct in bad faith has caused damages to the Funds and their shareholders. Total damages incurred are at least tens of millions of dollars, and likely substantially higher. Defendants are jointly and severally liable for all damages, losses and injuries caused thereby.

## COUNT VIII

### Derivative Claim for Violation of Duties as Agent ("Mandatario") of the Funds Pursuant to the Civil Code of the Commonwealth of Puerto Rico (Against UBS Trust)

188.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

189.    UBS Trust, as investment adviser of the Funds as Principal ("Mandante"), had a duty to act and perform the services hired in accordance to the instructions of the Funds, and in accordance to the applicable laws and regulations and to the nature of the business and the services hired, all in the framework of good faith as described in Count VII above. In the absence of instructions, all acts of UBS Trust, as Agent ("Mandatario") of the Funds, should have been exercised according to the standard of conduct of a good father of a family ("buen padre de familia").

190.    UBS Trust breached all instructions and agreements by and between the Funds by advising and acting in furtherance of its interest and the financial benefit of the Defendants against the instructions and best interest of the Funds as Principal.

191.    By exceeding the scope of the Agency ("Mandato"), by failing to comply with the Principal's instructions, and actively by participating in a scheme to defraud and deceive and by omitting material information from the Funds as Principal, UBS Trust is jointly and severally liable with other defendants to the Funds for negligence and fraud. The damages caused and which Defendants are jointly and severally liable are at least tens of millions of dollars, and likely substantially higher.

## COUNT IX

### Derivative Claims For Violations of Fiduciary Duties Owed to the Funds And Their Shareholders Pursuant to Articles 2.03, 4.03, 4.04 and 4.05 of Act Number 144 of August 10, 1995, as amended, also known as the "General Corporations Act of 1995"
### (Against the Director Defendants)

192.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

193.    Director Defendants, as Directors of the Funds, owed to the Funds and its shareholders the duties of care, diligence, fairness and loyalty required pursuant to Articles 2.03, 4.03, 4.04 and 4.05 of Act Number 144 of August 10, 1995, as amended, also known as the "General Corporations Act of 1995." Due to their positions and personal interest in the UBS Defendants, and the clear existence of a conflict of interest, those duties were subject to the highest standard of fiduciary duties.

194.    The actions, conduct, decisions and dealings of the Director Defendants as Directors of the Funds in the affairs of the Funds were all undertaken for the benefit and best interest of the UBS Defendants in a clear breach of all fiduciary duties owed to the Funds and its shareholders.

195.    The Defendant Directors were grossly negligent in the exercise of their fiduciary duties of loyalty, fairness and diligence to the Funds and its shareholders and all decisions and transactions approved by the Director Defendants in which the UBS Defendants had a direct or indirect financial and economic interest, including the purchase of the ERS Bonds, are null and void. As a result of this gross negligence Defendant Directors are jointly and severally liable with other defendants to the Plaintiffs

for the amounts claimed in this Complaint. Total damages incurred are at least tens of millions of dollars, and likely substantially higher.

## COUNT X

### Derivative Claims For Violations of Article 101(1-4), Article 102(a) and 103 of the Uniform Securities Act of the Commonwealth of Puerto Rico and Violations of Article 11, 12, 25.1, 25.2, 25.3.4, 25.3.5, 25.36, 25.3.8 25.3.13, 25.6.3. and 25.6.5 of Regulation 6078 (Against the UBS Defendants)

196.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

197.    The UBS Defendants, throughout the Relevant Period, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct designed to create, manipulate and artificially inflate the value of the ERS Bonds in order to extract unearned fees. They conspired and employed schemes, devices and artifices to defraud and engage in acts, practices, dealings and course of conduct that included, among others, the omission of material facts that the UBS Defendants had a duty to disclose to the Funds.

198.    The UBS Defendants through their participation in all aspects of the transactions, underwriting, investment adviser and broker-dealer, and through the positions of control of the Board of Directors of the Funds, created and participated in a fraudulent and illegal scheme and artifice to defraud that included the looting of the Funds by, among other things, causing the Funds to purchase ERS Bonds to maintain a market for those bonds and to benefit the UBS Defendants, at the expense of the Funds and its shareholders.

199. The UBS Defendants and Director Defendants are liable as direct participants and conspirators in the wrongs complained herein. It was through their positions of control, power and authority of each aspect of the transactions that each of them was able to and did control the conduct herein complained. The actions and omissions by all Defendants have caused and are jointly and severally liable to Plaintiffs for these losses. Total damages incurred are at least tens of millions of dollars, and likely substantially higher.

## COUNT XI

### Supplemental Jurisdiction Under 28 USC § 1367 and Attorneys Fees and Prejudgment Interest

200. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein

201. The facts set forth in this Complaint constitute violations to Federal as well as Commonwealth of Puerto Rico statutes. The claims arising from said violations arise from the same nucleus of operative facts. Supplemental jurisdiction to adjudicate all claims under Commonwealth law is appropriate under 28 USC § 1367. Defendants are liable jointly and severally to Plaintiffs for said violations.

202. The Defendants are jointly and severally liable to Plaintiffs for all sums requested in this Complaint, as well as for all prejudgment and post judgment interest, cost and attorneys fees as prescribed by Commonwealth law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A. Determining that Counts I, II, III, V, VII, VIII, IX, and X are properly maintained as a derivative action and that demand is excused;

B.      Certifying Counts IV and VI for treatment as a class action and appointing Plaintiffs and their counsel to represent the Class;

C.      A declaration that the Defendants have breached their fiduciary duties under ERISA to Plaintiff UDEM PRSSA and the ERISA Sub-Class;

D.      A declaration that the Defendants have breached their fiduciary duties under Commonwealth law to Plaintiff UDEM AP and the Class;

E.      A declaration that the Defendants have breached their fiduciary duties under Commonwealth law to the Funds and its shareholders;

F.      Judgment in favor of Plaintiffs, on behalf of the Funds, jointly and severally against Defendants, in an amount of actual and other damages to be determined at trial;

G.      Judgment in favor of Plaintiffs and members of the Class, jointly and severally against Defendants, in an amount of actual and other damages to be determined at trial;

H.      Awarding pre- and post-judgment interest;

I.      Awarding attorneys' fees;

J.      Awarding compensatory damages;

K.      Declaring a constructive trust with regard to all fees obtained in breach of Defendants' fiduciary and other duties to Plaintiffs, the Funds and/or the Class;

L.      Requiring disgorgement of all fees obtained from the Funds, Plaintiffs and/or the Class in breach of Defendants' fiduciary and other duties;

M.      Awarding cost of suit; and

N.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all causes of action averred in this Complaint.

## UDEM AP VERIFICATION

I, Luis A. Malavé Trinidad, President of the Board of Directors of UNION DE EMPLEADOS DE MUELLES DE PUERTO RICO AP WELFARE PLAN ("UDEM AP"), am authorized to execute this verification on behalf of UDEM AP.

I verify that I have reviewed the foregoing VERIFIED SHAREHOLDER DERIVATIVE ACTION AND CLASS ACTION COMPLAINT ("Complaint"). The facts set forth in the Complaint that relate to UDEM AP's acts and deeds are true to my own knowledge and upon information and belief. With respect to the facts set forth in the Complaint that relate to the acts and deeds of others, as to those matters, I believe them to be true.

I further verify that, as alleged in the complaint, UDEM AP was a shareholder of Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., and the Tax-Free Puerto Rico Fund II, Inc. and will remain a shareholder during the course of the lawsuit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of February, 2010 in San Juan, Puerto Rico.

_____
LUIS A. MALAVÉ TRINIDAD

## UDEM PRSSA VERIFICATION

I, Luis A. Malavé Trinidad, President of the Board of Directors of UNION DE EMPLEADOS DE MUELLES DE PUERTO RICO PRSSA WELFARE PLAN, ("UDEM PRSSA"), am authorized to execute this verification on behalf of UDEM PRSSA.

I verify that I have reviewed the foregoing VERIFIED SHAREHOLDER DERIVATIVE ACTION AND CLASS ACTION COMPLAINT ("Complaint"). The facts set forth in the Complaint that relate to UDEM PRSSA's acts and deeds are true to my own knowledge and/or upon information and belief. With respect to the facts set forth in the Complaint that relate to the acts and deeds of others, as to those matters, I believe them to be true.

I further verify that, as alleged in the complaint, UDEM PRSSA was a shareholder of Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., and the Puerto Rico Fixed Income Fund IV, Inc. and will remain a shareholder during the course of the lawsuit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of February, 2010 in San Juan, Puerto Rico.

LUIS A. MALAVÉ TRINIDAD

Dated: February 19, 2010

Harry Anduze Montaño - 114910
**HARRY ANDUZE MONTAÑO**
 **LAW OFFICES**
1454 Fernández Juncos  Avenue
San Juan PR  00909
Tel:    (787) 723-7171
Fax:    (787) 723-7278
handuze@microjuris.com

By: _____
         Harry Anduze Montaño

José Sosa Llorens- 203801
**SOSA LLORENS, CRUZ NERIS &**
 **ASSOCIATES, LLP**
Centro Internacional de Mercadeo
Carr. 165, Torre I,
Suite 605
Guaynabo, PR 00968
Tel:  (787) 782-3400
Fax:  (787) 782-3440
j.sosa@slcnlaw.com

By:_____
         José Sosa Llorens

Jay W. Eisenhofer
Keith M. Fleischman
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Tel.: 646-722-8500
Fax: 646-722-8501
jeisenhofer@gelaw.com
kfleischman@gelaw.com

Cynthia A. Calder
Mary S. Thomas
**GRANT & EISENHOFER P.A.**
1201 North Market Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100
ccalder@gelaw.com
mthomas@gelaw.com

Mark C. Gardy
James S. Notis
Kelly A. Noto
**GARDY & NOTIS, LLP**
560 Sylvan Avenue
Englewood Cliffs, NJ 07632
Tel.: 201-567-7377
Fax: 201-567-7337
mgardy@gardylaw.com
jnotis@gardylaw.com
knoto@gardylaw.com

Douglas R. Hirsch
Charles H. Dufresne, Jr.
Christiaan D. Johnson-Green
**SADIS & GOLDBERG LLP**
551 Fifth Avenue, 21st Floor
New York, NY 10176
Tel: 212-573-6660
Fax: 212-573-6661
dhirsch@sglawyers.com
cdufresne@sglawyers.com
cjohnson-green@sglawyers.com

*Attorneys for Plaintiffs*