## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNION DE EMPLEADOS DE MUELLES DE PUERTO RICO PRSSA WELFARE PLAN, et al.**<br>　　　　**Plaintiffs,**<br><br>　　**v.**<br><br>**UBS FINANCIAL SERVICES INC. OF PUERTO RICO, et al.,**<br>　　　　**Defendants.** | **Civil No.10-1141 (ADC)** |

## OPINION AND ORDER

Plaintiffs, Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan ("PRSSA") and Unión de Empleados de Muelles de Puerto Rico AP Welfare Plan ("AP")(collectively, "plaintiffs") filed the present action for violations of federal securities law and Commowealth law against three groups of defendants: the "UBS defendants" - UBS Financial Services Incorporated of Puerto Rico ("UBS PR"), UBS Trust Company of Puerto Rico ("UBS Trust") (collectively, "UBS defendants"); the "Director defendants" - Miguel A. Ferrer ("Ferrer"), Carlos V. Ubiñas ("Ubiñas"), Stephen C. Roussin ("Roussin"), Leslie Highley, Jr. ("Highley"), Mario S. Belaval ("Belaval"), Agustín Cabrer-Roig ("Cabrer-Roig"), Gabriel Dolagaray-Balado ("Dolagaray"), Carlos Nido ("Nido"), Luis M. Pellot-González ("Pellot"), Vicente J. León ("León"), Clotilde Peŕez ("Pérez"); and "Nominal defendants" - Puerto Rico Fixed Income Fund II, Inc. ("Fund II"), Puerto Rico Fixed Income Fund III, Inc. ("Fund III"), Puerto Rico Fixed Income Fund IV, Inc. ("Fund IV") and Tax-Free Puerto Rico Fund II, Inc. ("Tax-free fund," collectively "Funds") (all three sets of defendants collectively referred to as "defendants").[1]  **ECF No. 1**.  With specific regards to the claims, plaintiffs allege eight (8) derivative claims[2] on behalf of the Nominal defendants for violations of the Securities

---

[1] Plaintiffs also brought the present action against "Does" No. 1-100.

[2] Plaintiffs allege the following derivative action claims: I - Derivative Claim for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 against the UBS defendants; II - Derivative Claim for Violation of Section 20(a) of the Exchange Act against Ferrer, Ubiñas, Roussin and Highley; III - Derivative Claim for violation of Section 12(a)(2) of the Securities Act against UBS defendants; IV - Derivative Claim for Unjust

Exchange Act and other common law claims; two (2) class action claims for breach of ERISA Fiduciary duties and violations of the duty to act in good faith; and one (1) claim pursuant to 28 U.S.C. § 1367 for attorneys' fees and prejudgment interest. **ECF No. 1**. Presently pending before the court is defendants' motion to dismiss the complaint[3], plaintiffs' timely opposition and defendants' reply. **ECF Nos. 35, 41, 47**.

## I.    Background

Unless otherwise mentioned, the following facts arise from plaintiffs' complaint. **ECF No. 1**.

Plaintiffs, PRSSA and AP are welfare plans that own stock in some of the Funds. **ECF No. 1** at ¶¶ 23, 24. UBS Trust is the issuing, paying and transfer agent for the Funds. *Id.* at ¶ 27. The Director defendants each serve on the Board of Directors of each of the Funds.[4] *Id.* at ¶¶ 30-41. Plaintiffs allege that the Director defendants owed the Funds: (1) the duty to exercise due care and diligence in the management and administration of the Funds; and (2) owed its shareholders as well, duties of loyalty, good faith and candor. *Id.* at ¶ 43. Plaintiffs also allege that UBS Trust, and UBS PR as its alter ego, had a contractual obligation to the Funds to act in good faith and in a loyal, honest and fair manner. *Id.* at ¶ 46.

In 2007, UBS PR became a financial advisor to the Employee Retirement System of the

---

Enrichment/Constructive Trust against all defendants; V - Derivative Claim for violations of Duty to Act in Good Faith against all defendants; VI - Derivative Claim for violations of duties as Agent of the Funds pursuant to Commonwealth law against UBS Trust; VII - Derivative Claims for violations of fiduciary duties pursuant to Commonwealth law against the Director defendants; VIII - Derivative Claim for violation of Commonwealth Securities law against the UBS defendants.

[3]Defendants' motion to dismiss presents three separate arguments: (1) that the derivative claims should be dismissed for failure to comply with the pleading requirements of derivative action claims; (2) that all the claims should be dismissed for failure to state a claim upon which relief can be granted; and (3) that the fraud claims should be dismissed for failure to plead with particularity. **ECF No. 35** at 12. While all three sets of defendants have joined the arguments for dismissal in a single motion to dismiss, the court notes that Nominal defendants have joined only that portion of the motion raising to the first argument, namely, that the derivative claims should be dismissed for failure to comply with the pleading requirements. **ECF No. 35** at 12, n. 2.

[4]Based on the allegations of the complaint, the court understands that each of the individual Director defendants serve on the Boards of Directors of each of the Funds, with Ferrer as the Chairman of the Board of Directors and President of each of the Funds, and Ubiñas as the Vice Chairman of the Board of Directors and Executive Vice President of each of the Funds. **ECF No. 1** at 30-41.

Government of Puerto Rico ("ERS").  *Id.* at ¶ 4.  The ERS is a public retirement plan that the government of Puerto Rico maintains for its employees.  *Id.* at ¶ 3.  In or around 2008, ERS sought to sell pension bonds ("ERS bonds") in a series of three bond offerings.  *Id.* at ¶ 50. UBS PR served as an underwriter for these bond offerings and received, along with other co-underwriters, approximately $27 million in fees.  *Id.*  Plaintiffs allege that the ERS bonds were of low quality.  *Id.* at ¶ 51.

Series A of the ERS bonds were offered in Puerto Rico in late January 2008.  *Id.* at ¶ 53**.** In a statement describing the Series A ERS bonds, dated January 29, 2008, the underwriters, including UBS PR, stated, "[i]n connection with the offering of the series A bonds, the underwriters may effect transactions which stabilize or maintain the market prices of the series A bonds at levels above those which might otherwise prevail in the open market.  Such stabilizing, if commenced, may be discontinued at any time."  *Id.* at ¶ 54.  The Funds purchased almost $325 million in ERS bonds from the Series A offering.  *Id.* at ¶ 56.

Series B of the ERS bonds were offered in late May 2008.  *Id.* at 58.  The underwriters again stated, "[i]n connection with the offering of the series B bonds, the underwriters may effect transactions which stabilize or maintain the market prices of the series B bonds at levels above those which might otherwise prevail in the open market.  Such stabilizing, if commenced, may be discontinued at any time."  *Id.* at ¶ 59.  The Funds purchased over $430 million in ERS bonds from this offering.  *Id.* at ¶ 61.

Finally, in June of 2008, Series C of the ERS bonds were offered.  *Id.* at ¶ 62.  The underwriters again stated, ""[i]n connection with the offering of the series C bonds, the underwriters may effect transactions which stabilize or maintain the market prices of the series C bonds at levels above those which might otherwise prevail in the open market.  Such stabilizing, if commenced, may be discontinued at any time."  *Id.* at ¶ 63.  The Funds purchased nearly $2 million in ERS bonds from this offering.  *Id.* at ¶ 64.

## II.    Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6),  the court "take[s] as true all well-pleaded allegations and draw[s] all reasonable inferences in the plaintiff's favor."  *Ezra Charitable Trust v. Tyco*

*Int'l, Ltd.*, 466 F.3d 1, 5-6 (1st Cir. 2006); *see also Ashcroft v. Iqbal*, No. 07-1015, 129 S. Ct. 1937, 2009 WL 1361536, *13 (May 18, 2009); *Maldonado v. Fontanes*, 568 F.3d 263 (1st Cir. 2009).  The overall assessment of the adequacy of a plaintiff's pleading is guided by two principles.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 2009 WL 1361536, at *13.  Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* (citing *Bell Atl. v. Twombley*, 550 U.S. 544, 556 (2007)).  Whether a complaint states a plausible claim for relief is a context-specific task, where the court must "draw on its judicial experience and common sense."  *Id.*  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id.* (citing Fed. Rule Civ. Proc. 8(a)(2)).  After evaluating the allegations in the complaint, the court then determines whether the plaintiff has stated a claim under which relief can be granted.

III.    **Discussion**

        Defendants' motion seeks dismissal of plaintiffs' entire complaint by way of three arguments: (1) that the derivative claims should be dismissed for failure to comply with the pleading requirements of derivative action claims; (2) that all the claims should be dismissed for failure to state a claim upon which relief can be granted; and (3) that the fraud claims should be dismissed for failure to plead with particularity.  **ECF No. 35** at 12**.**  The court entertains each argument separately.

        A.      **Pleading Requirements of a Derivative Claim**

        Pursuant to Fed. R. Civ. P. 23.1(b) ("Rule 23.1(b)") a complaint alleging a derivative action must be verified and must allege: (1) that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law; (2) that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and (3) the efforts by plaintiff to obtain the desired action from the directors and the reasons for not obtaining the action or not making

the effort.  Fed. R. Civ. P. 23.1(b).  Importantly, the requirements of Rule 23.1(b) establish only the elements required to be pled, and do not relate to plaintiff's standing to bring the claim.[5]  *González Turel v. Rogatol Distributors, Inc.*, 951 F.2d 1, 2 (1st Cir. 1991).

At the outset, the court notes that plaintiff PRSSA alleges only that it is a shareholder of Funds II, III and IV.  **ECF No. 1** at ¶ 98[6].  Inasmuch as PRSSA has not alleged that it was, or is, a shareholder in the tax-free fund, PRSSA cannot bring any claims on behalf of the tax-free fund.  *See* Rule 23.1(b)(1).  Accordingly, defendants' motion to dismiss the derivative claims of PRSSA brought on behalf of tax-free fund is **GRANTED**.  Plaintiff PRSSA's derivative claims on behalf of tax-free fund are **DISMISSED**.  Plaintiff AP was a shareholder of each of the Funds at the time of the relevant transactions, and therefore, may bring derivative claims on behalf of the Funds.  **ECF No. 1** at ¶ 99.

Returning to Rule 23.1(b), the third requirement, referred to as the "demand requirement," represents a deliberate departure from the relaxed policy of "notice" pleading promoted elsewhere in the Federal Rules and places the burden on the shareholder to demonstrate why the directors are incapable of filing the case themselves.  *Grossman v. Johnson*, 89 F.R.D. 656, 659 (D.C. Mass 1981).  Thus, the statute's explicit requirement that the efforts made to request the desired action or the reasons for not making such effort be pled "with particularity."  Fed. R. Civ. P. 23.1(b).

Whether or not a plaintiff has adequately pled the demand requirement is a question of state law.  *Kamen v. Kemper Fin. Servs.* 500 U.S. 90 (1991).  However, Puerto Rico law does not provide guidance as to the specifics of pleading the demand requirements.  *González Turel*,

---

[5]Accordingly, a motion to dismiss based on failure to adequately conform to the requirements of Rule 23.1(b) is governed by the dictates of Rule 12(b)(6) in which all well-pleaded allegations are taken as true and all reasonable inferences will be drawn in plaintiff's favor.  *Beam v. Stewart,* 883 A.2d 961, 976 (Del. Chl. 2003)("On a motion to dismiss pursuant to Rule 23.1, the Court considers the same documents, similarly accepts well-pled allegations as true, and makes reasonable inferences in favor of the plaintiff – all as it does in considering a motion to dismiss under Rule 12(b)(6)").

[6]"Plaintiff UDEM PRSSA was a shareholder of Funds II, III, and IV at the time of the relevant transactions alleged herein and has continued to hold shares of Funds II, III and IV since that time."  **ECF No. 1** at ¶ 98.

951 F.2d at 3.  Inasmuch as Puerto Rico law is modeled after Delaware's corporate law, this court considers the question of whether plaintiff has adequately pled the demand requirement under Delaware corporate law.  *Id.*; *see also Wiley v. Stipes*, 595 F. Supp. 2d 179, 185 (D.P.R. 2009).

Given that plaintiffs' complaint concedes that no demand was made of the board, the sole question before the court is whether plaintiffs adequately pled that making such demand would be futile.  Delaware law establishes two separate tests for demonstrating futility: the *Aronson* test and the *Rales* test.  The *Aronson* test excuses demand if a "reasonable doubt" arises from the particularized facts alleged that (1) the directors are disinterested and independent; or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.  *García v. Carrión*, 2010 U.S. Dist. Lexis 85705, *9 (D.P.R. 2010) (citing *Aronson v. Lewis*, 473 A.2d 805, 812, 815 (Del. 1984)).  The *Rales* test inquires as to whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time of the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.  *Id.* (citing *Rales v. Blasband,* 634 A.2d 927, 934 (Del. 1993).  Because demand futility is analyzed on a claim by claim basis, the test used is dependent on the particular facts of the claim being analyzed.  *Beam v. Stewart,* 883 A.2d 961, 977, n. 48 (Del. Ch. 2003).  Where the claim alleges that the directors themselves have acted or have consciously failed to act, the *Aronson* test applies.  *García*, 2010 U.S. Dist. Lexis 85705 at 10; *see also Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).  On the other hand, the *Rales* test is employed where the claim alleges that the director-defendants are not themselves responsible for the conscious act or failure in question.  *Id.*

Using the above framework, the court turns to plaintiffs' remaining derivative claims.  Plaintiffs' complaint states that "all claims asserted derivatively challenge the Funds' boards' decisions to purchase the ERS bonds on behalf of the Funds."  **ECF No. 1** at ¶ 102.  Since plaintiffs have affirmatively represented that all eight of the derivative claims deal with the same action, the court applies the *Aronson* test to determine whether plaintiffs have

adequately pled demand futility.[7] *García*, 2010 U.S. Dist. Lexis 85705 at 10. Under the *Aronson* test, plaintiffs can establish demand futility by alleging particular facts that create a reasonable doubt as to either the Director defendants' independence or interest or that the decision to purchase the ERS bonds was not a valid business judgment.

> **1.    *Aronson* First Prong**

A director will be considered unable to act objectively with respect to a pre-suit demand if he or she is interested in the outcome of the litigation or is otherwise not independent. *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004). In determining the sufficiency of factual allegations made by a plaintiff as to a director's interest or lack of independence, the court is to use a subjective "actual person" standard to determine whether a particular director's interest is material and debilitating or that he lacks independence because he is controlled by another. *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002).

While the inquiry as to interest and/or independence of a particular director may overlap, they are two separate and distinct issues. *Orman*, 794 A.2d at 25, n.50. A disabling "interest," as defined by Delaware common law exists in two situations. *Id.* The first is when a director personally receives a benefit, or suffers a detriment, as a result of the challenged transaction which is not generally shared with, or suffered by, the other shareholders of his corporation, and that benefit, or detriment, is of such subjective material significance to that particular director that it is reasonable to question whether that director objectively considered the advisability of the challenged transaction to the corporation and its shareholders. *Id.* The second instance is when a director stands on both sides of the challenged transaction. In such an instance, no allegations of materiality are required since he is deemed interested. *Id.* "Independence" involves an inquiry into whether the director's decision resulted from that director being controlled by another - it does not involve a question of whether the challenged director derives a benefit from the transaction. *Id.* A

---

[7] Plaintiffs agree that the *Aronson* test is the applicable test in that their opposition recites the test as the applicable one: "A plaintiff demonstrates demand futility and demand is excused where, "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested or independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." **ECF No. 41** at 32.

director can be controlled by another if in fact he is dominated by that other party, whether through close personal or familial relationship or through force of will. *Id.* A director may also be considered beholden when the controlling entity has the unilateral power to decide whether the challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent that the threatened loss of such, might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction. *Id.* The key issue under either analysis is not simply whether a particular director receives a benefit or whether he is controlled by another, but whether the possibility of gaining or losing such is likely to be of such importance to that director that it is reasonable to question the director's vote. *Id.*

The court looks at each of the Director defendants separately.

### a.      Ferrer

Plaintiffs' complaint alleges that there is reasonable doubt as to Ferrer's independence and impartiality in that he is a highly placed officer at UBS PR and UBS Trust, therefore, he financially benefitted from the ERS bonds transaction. **ECF No. 1** at ¶¶ 30[8], 114[9]. Additionally, plaintiffs argue that Ferrer had a strong incentive to retain his position with the board and, therefore, was beholden to the UBS defendants.[10] **ECF No. 41** at 34-37. As the

---

[8]As to Ferrer, the complaint alleges, "Defendant Miguel A. Ferrer ("Ferrer") is Chairman of the Board of Directors and President of each of the Funds. Until September 2009, Ferrer served as the Chief Executive Officer ("CEO") of UBS Financial and CEO of UBS Trust. Ferrer is now reportedly Chairman of an entity known as UBS International & Puerto Rico." **ECF No. 1** at ¶ 30.

[9]The complaint states, "A reasonable doubt exists that the inside directors, Defendants Ferrer, Ubiñas, Roussin, and Highley, are independent, and would have been able to impartially consider a demand at the time this complaint was filed. As highly placed officers of UBS Financial [UBS PR], UBS Trust, or, in Ferrer's case, of both, these defendants were direct beneficiaries of the fraud worked on the Funds. Those defendants who were officers of UBS Trust benefitted from the Funds payment of inflated management fees. Similarly, those defendants who were officers of UBS Financial benefitted from the manipulative conduct engaged in by the UBS Defendants in connection with the distribution of the ERS Bonds. The benefits received by these defendants as a consequence of their participation in the fraud and their relationships with the UBS Defendants are both pecuniary and reputational in nature." **ECF No. 1** at ¶ 114.

[10]Plaintiffs' argument, as set in their opposition to the motion to dismiss, does not refer to Ferrer individually, but the allegations are made in relation to all the Director defendants: "Here, there can be no doubt that a majority of the Director Defendants lack independence from the UBS Defendants. The fact that

court understands it, plaintiffs question defendants' interest and independence.

With regards to independence, the court finds that plaintiffs have not raised a reasonable doubt as to Ferrer's independence. While plaintiffs allege that Ferrer is beholden to the UBS defendants because of benefits received, they provide no additional facts that allow this court to gauge the materiality of such benefits to Ferrer. Conclusory allegations that a director's independence is compromised where his continued employment and/or compensation can be affected are insufficient without showing how such compensation or employment is material to the director. *Orman v. Cullman*, 794 A.2d 5, 25 n. 50 (Del. Ch. 2002); *see also MCG Capital Corp. v. Maginn*, 2010 Del. Ch. Lexis 87, *74 (Del. Ch. 2010)("For Director compensation to create independence problems, however, it must be shown that the compensation is material to the director.").

However, taking all reasonable inferences from the complaint, plaintiffs' allegations do allow this court to infer that Ferrer was on all sides of the transaction such that interest may be presumed. *Orman*, 794 A.2d at 25, n.50. Plaintiffs allege that Ferrer was Chief Executive Officer of UBS PR and UBS Trust until September 2009. **ECF No. 1** at ¶ 30. UBS PR acted as an advisor to ERS and as the underwriter for the ERS bonds transaction and UBS Trust, who is alleged to have been charged with ensuring that the Funds purchased suitable and appropriate investments, purchased the ERS bonds for the Funds it managed. **ECF No. 1** at ¶¶ 70, 71, 72. Thus, the court finds that plaintiffs have adequately pled that Ferrer was interested or had an interest in the transaction and therefore may not have been able to objectively evaluate any demand by plaintiffs.

### b.    Ubiñas

Plaintiffs advance identical arguments and allegations regarding Ubiñas - that he was beholden to UBS and that he had an interest in the ERS bonds transaction. **ECF No. 1** at ¶¶

---

most of the outside directors serve, or have served, as directors of numerous other UBS affiliates demonstrates that they have reasons other than the Funds' best interests to accede to the UBS Defendants wishes. . . These defendants therefore have a strong incentive to preserve those positions by doing UBS's bidding, e.g., engaging in the transactions at issue." **ECF No. 41** at 33-35.

31[11], 114;  **ECF No. 41** at 34-37.  Similarly, as the court has already found with regard to Ferrer, plaintiffs' allegations do not raise a reasonable doubt as to Ubiñas' independence.

With regards to interest, the court cannot, as it did with Ferrer, presume interest because plaintiffs' allegations do not establish that Ubiñas was on all sides of the ERS bonds transaction.   Ubiñas is alleged to serve as President of UBS PR, but has no role with UBS Trust.  **ECF No. 1** at ¶ 31.  Nor can the court find that Ubiñas had an interest in the ERS bonds transaction in that no particularized allegations have been made to show the "subjective material significance" of the financial or  reputational benefit gained by Ubiñas from said transaction.  *Orman*, 794 A.2d at  25 n. 50 ("The first is  when a director personally receives a benefit, or suffers a detriment, as a result of the challenged transaction which is not generally shared with, or suffered by, the other shareholders of his corporation, and that benefit, or detriment, is of such subjective material significance to that particular director that it is reasonable to question whether that director objectively considered the advisability of the challenged transaction to the corporation and its shareholders.").  Thus, the court finds that plaintiffs have not sufficiently pled that Ubiñas was interested or lacked independence.

### c.    Roussin

Again, plaintiffs make similar arguments for Roussin as those made for Ubiñas and Ferrer.  **ECF No. 1** at ¶¶ 32[12], 114;  **ECF No. 41** at 34-37.  As has been stated previously, plaintiffs' naked allegations regarding benefits received without showing how such benefits are material to Roussin do not establish a reasonable doubt as to Roussin's independence. *Orman*, 794 A.2d at 25 n. 50.  As for interests, plaintiffs' allegations do not establish that Roussin was on all sides of the ERS bonds transaction - the complaint states only that Roussin was a  Managing Director of UBS PR.  *Id.* at ¶ 32.  Thus, the court cannot presume interest.

---

[11]"Defendant Carlos V. Ubiñas ("Ubiñas") is Vice Chairman of the Board of Directors and Executive Vice President of each of the Funds.  Ubiñas has served as President of UBS Financial since 2005 and now reportedly serves as CEO of an entity known as UBS International & Puerto Rico."  **ECF No. 1** at 31.

[12]"Defendant Stephen C. Roussin ("Roussin") is a Director of each of the Funds and Managing Director of UBS Financial."  **ECF No. 1** at 32.

Nor can the court find that Roussin had an interest in the ERS bonds transaction in that no particularized allegations have been made to show the "subjective material significance" of the financial or reputational benefit gained from the transaction to Roussin. *Id*. Thus, the court finds that plaintiffs have not sufficiently pled that Roussin was interested or lacked independence.

### d.    Highley

Plaintiffs make the same arguments for Highley that they made for the preceding three directors. **ECF No. 1** at ¶ ¶ 33[13], 114; **ECF No. 41** at 34-37. Having examined plaintiffs' allegations, as in Roussin's case, plaintiffs' allegations do not establish a reasonable doubt as to Highely's independence. However, as to interest, Highley, like Ferrer, is alleged to hold positions at both UBS PR and UBS Trust. Specifically, he is alleged to be the Managing Director and Executive Vice President of UBS Trust and Senior Vice President of UBS PR. **ECF No. 1** at ¶ 33. Thus, plaintiffs' allegations allow this court to infer that Highley was on all sides of the transaction such that interest may be presumed. *Orman*, 794 A.2d at 25, n.50. Thus, the court finds that plaintiffs have adequately pled that Highley was interested in the transaction and therefore may not have been able to objectively evaluate any demand by plaintiff.

### e.    Belaval

Plaintiffs allege and argue that Belaval is beholden to the UBS defendants, and Ferrer, Ubiñas, Roussin and Highley ("inside directors"), because he is a director of other funds affiliated with UBS, including UBS's IRA Select Growth and Income Fund, and receives remuneration for such positions.[14] **ECF No. 1** at ¶¶ 34, 115; *see also supra* n.8. In support of

---

[13]"Defendant Leslie Highley, Jr. ("Highley") is a Director of each of the Funds, managing Director and Executive Vice President of UBS Trust, and Senior Vice President of UBS Financial. Highley, acting on behalf of UBS Trust (through its UBS Asset Mangers division), has served as Portfolio Manager for Fund II and Fund III since 2004, for Fund IV since 2005, and for Tax-Free Fund II since 2002." **ECF No. 1** at ¶ 33.

[14]The complaint states: "Moreover, each of the outside directors of the Funds, defendants Belaval, Cabrer-Roig, Nido, León, Pérez, Dolagaray-Balado, and Pellot-González, are beholden to the inside directors or so under their influence that their discretion would be sterilized. Each of the "outside" directors acts as a director for numerous other UBS-affiliated investment funds. Thus, each "outside" director depends on the

their allegation that such remuneration makes Belaval beholden, plaintiffs further allege that for the fiscal year ending July 31, 2009, Belaval's aggregate compensation for service on the boards of Funds advised or co-advised by UBS Trust was reported to be $137,531 and that such income is approximately four times the median household income in Puerto Rico. *Id.*

Plaintiffs' allegations, without more particularized facts, do not establish reasonable doubt. *Aronson,* 473 A.2d at 815-816 ("[I]n the demand-futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling. The shorthand shibboleth of 'dominated and controlled directors' is insufficient."); *see also In re Affiliated Computer Servs. S'holders Litig.,* 2009 Del. Ch. Lexis 35, *31 (Del. Ch. 2009)("Thus, the mere allegation that a director is dominated and controlled does not raise a reasonable doubt as to his or her independence."). Moreover, plaintiffs' allegations of the actual compensation received does not help the argument because they provide no additional facts that allow this court to gauge the materiality of such benefits to Belaval. Conclusory allegations that a director's independence is compromised where his continued employment and/or compensation can be affected are insufficient without showing how such compensation or employment is material to the director. *Orman*, 794 A.2d at 25 n. 50; *see also MCG Capital Corp. v. Maginn,* 2010 Del. Ch. Lexis 87, *74 (Del. Ch. 2010)("For Director compensation to create independence problems, however, it must be shown that the compensation is material to the director.").

Finally, plaintiffs argue that Belaval is beholden to the UBS defendants because he knows that, in order to raise capital in the Puerto Rican market he will need the UBS defendants' cooperation and therefore, as a person with other business enterprises, would be more apt to make decisions that favor the UBS defendants. **ECF No. 41** at 36-37. Again, plaintiffs fail to allege particularized facts that would demonstrate to the court that Belaval consistently put the concerns of the UBS defendants above those of the Fund when making

---

UBS Defendants for substantial remuneration in addition to the director fees received for services rendered to the Funds." **ECF No. 1** at ¶ 115.

decisions regarding the Fund.  *Aronson,* 473 A.2d at 815-816 (" The shorthand shibboleth of 'dominated and controlled directors' is insufficient.").  Thus, the court finds that plaintiffs have not established a reasonable doubt as to Belaval's independence.  Inasmuch as plaintiffs have made no argument as to interest, the court does not go further in its analysis.

### f.    Nido and León

Plaintiffs make the exact same arguments with regards to Nido and León as they did with Belaval.  Inasmuch as the allegations regarding the three directors are similar, the court finds that the court's analysis as to Belaval applies to both Nido and León.[15]  Accordingly, the court finds that plaintiffs have not established a reasonable doubt as to Nido's or León's independence.

---

[15]The complaint, in its relevant parts, states as follows:

34.    Defendant Mario S. Belaval ("Belaval") is a Director of each of the Funds.  Belaval is Vice Chairman of Triple S management ("Triple S"), the largest managed care company in Puerto Rico.  UBS Investment Bank received large fees from acting as co-lead underwriter of Triple S's IPO.  In 2006, UBS Financial served as the placement agent for $35 million in notes issued by Triple-S, all of which were purchased by Fund IV and another UBS-affiliated fund.  Belaval has also served as a director of numerous other UBS-affliated funds including UBS's IRA Select Growth and Income Fund.  *Id.*  For the fiscal year ending July 31, 2009, Belaval's aggregate compensation for service on the boards of Funds advised or co-advised by UBS Trust was reported to be $137,531.

37.    Defendant Carlos Nido ("Nido") is Director of each of the Funds.  Nido is Vice President of Sales for El Nuevo Día, a leading newspaper in Puerto Rico.  Fund III and other UBS-affiliated funds have at times invested in notes issued by El Nuevo Dia.  Nido sits on the board of several other UBS funds, including the AAA Portfolio Bond Fund II and the Puerto Rico Short Term Investment Fund.  For the fiscal year ending July 31, 2009, Nido's aggregate compensation for services on the boards of funds advised or co-advised by USB Trust was reported to be $92,031 (excluding expenses).

39.    Defendant Vicente J. León ("León") is a Director of each of the Funds.  Leon is, along with Belaval, Vice Chairman of Triple-S.  In 2006, UBS Financial served as the placement agent for $35 million in notes issued by Triple-s, all of which were purchased by Fund IV and the Puerto Rico AAA Portfolio Target Maturity Fund.  León also sits on the board of several UBS funds,  including Tax-Free Puerto Rico Fund, Target Maturity Fund, Puerto Rico AAA Portfolio Target Maturity Fund, Portfolio Bond Fund, Portfolio Bond Fund-H, Puerto Rico GNMA & U.S. Government Target Maturity Fund, Puerto Rico Mortgage-Backed and U.S. Securities Fund, UBS IRA Selected Growth and Income Fund, Multi-Select Securities Puerto Rico Fund, and the Puerto Rico Short Term Investment Fund.  For the fiscal year ending July 31, 2009, Leon's aggregate compensation for service on the boards of Funds advised or co-advised by UBS Trust was reported to be $68,531.

### g.      Cabrer-Roig, Dolagaray, Pellot, Pérez

As to the remaining four directors, Cabrer-Roig, Dolagaray, Pellot, and Pérez, plaintiffs argue, as they did with Belaval, that they are beholden to the UBS defendants, and the inside directors, because they are directors of other funds affiliated with UBS and receive remuneration for such positions. **ECF No. 1** at ¶¶ 35, 36, 38, 40, 115; *see also supra* n. 13. Moreover, the allegations as to each of these four directors, although different in detail, generally allege that the directors sit on the boards of other UBS funds and specifies the income received by the director for the fiscal year ending July 31, 2009. **ECF No. 1** at ¶¶ 35, 36, 38, 40. Thus, the court finds that the analysis as to Belaval's independence also applies to Cabrer-Roig, Balado, Pellot and Clotilde. Accordingly, the court finds that plaintiffs have not established a reasonable doubt as to Cabrer-Roig, Dolagaray, Pellot, and Pérez' independence.

Having looked at each director and the facts alleged as to each, the court finds that plaintiffs have not established a reasonable doubt as to a majority of the directors independence or interest. Therefore, plaintiffs have failed on the first prong of *Aronson*.

### 2.      *Aronson* Second Prong

As discussed earlier, the two prongs of *Aronson* are disjunctive, thus a plaintiff need only establish one of the prongs in order for demand to be excused. Having found that plaintiffs' have not satisfied prong one, the court moves on to prong two. *Aronson's* second prong requires plaintiffs to establish a reasonable doubt that the decision to purchase the ERS bonds was not a valid business judgment.

When applying this second prong, the court does not assume the challenged transaction constitutes a wrong to the corporation; instead the court must examine the substantive nature of the challenged transactions and the board's approval thereof. *Khanna v. McMinn*, 2006 Del. Ch. Lexis 86, 91 (Del. Ch. 2006) (citing *Aronson*, 473 A.2d at 814). Absent particularized allegations to the contrary, the directors are presumed to have acted on an informed basis and in the honest belief that their decisions were in furtherance of the best interests of the corporation and its shareholders. *Id.* Thus, demand futility will be established under this prong if the plaintiff pleads particularized facts that create a reasonable doubt (1) that the action was taken honestly and in good faith or (2) that the board was adequately

informed in making the decision - meaning whether the directors took steps to inform themselves of material information and whether they adequately inquired into the reasons for or terms of the transaction. *MCG Capital Corp. v. Maginn*, 2010 Del. Ch. Lexis 87, *60 (Del. Ch. 2010). The court's inquiry in this context is predicated upon concepts of gross negligence. *Khanna*, 2006 Del. Ch. Lexis 86 at 92-93. Importantly, the second prong of *Aronson* is directed to "extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review. . . . As a consequence, a plaintiff will bear a difficult, but not insurmountable, burden in pleading particularized facts demonstrating demand futility under this prong of *Aronson*." *Khanna*, 2006 Del. Ch. Lexis 86 at 92-93.

Plaintiffs identify several grounds upon which they contend that the ERS bonds transaction was not a valid exercise of the Funds' Board of Directors' business judgment. They argue that (1) the purchase of the ERS bonds was an interested -director transaction; (2) the ERS bond purchases were not undertaken in good faith in violation of the Director defendants' duty of loyalty; (3) the Director defendants were grossly negligent in their failure to inform themselves of the details and circumstances surrounding the ERS bonds transaction; and (4) the very nature of the ERS bonds transaction creates reasonable doubt as to whether the purchase of the ERS bonds transaction was the product of a valid business judgment. **ECF No. 1** at 102-112; *see also* **ECF No. 41** at 37-40. The court addresses each argument separately.

### a.        Interested-Director Transaction

Plaintiffs first argue that the ERS bonds transaction constitutes an "interested-director" transaction in that the Director defendants stood to receive, and did receive, significant personal benefits – meaning additional compensation or opportunities to serve as directors of other UBS funds – not shared equally by the Funds' shareholders. **ECF No. 1** at ¶ ¶ 104-107. As far as the court can understand, plaintiffs are arguing that the alleged benefits received from the ERS bonds transaction prevented the Director defendants from objectively considering the transaction and therefore, the decision to purchase the ERS bonds was not a valid business judgment.

However, besides their conclusory pleadings, plaintiffs' complaint contains no

particularized allegations that demonstrate that the Director defendants were interested in the transaction. There are no allegations regarding the materiality of the alleged benefits to the individual directors, nor are there any allegations as to a pattern of conduct that would show that the Director defendants were motivated by such benefits. Accordingly, the court finds that plaintiffs have failed to adequately plead that the ERS bonds transaction was an "interested-director" transaction such that the business judgment rule does not apply to the Funds' Board of Directors' decision to purchase the ERS bonds.[16]

### b.    Duty of Loyalty

Plaintiffs next argue that the Director defendants acted in bad faith, violating or disregarding their duties of loyalty, in that they participated in a scheme to inflate the price of the ERS bonds, causing the Funds to overpay for the ERS Bonds and to cause misstatements of their value. **ECF No. 1** at 110-111. Again, as best as the court can understand, plaintiffs are arguing that the UBS defendants intended to inflate and misstate the price of the ERS bonds by participating on both sides of the ERS bonds transaction, that the Director defendants knew of such intention and, with such knowledge, purchased the ERS bonds for the Funds because of their own self interest. As such, plaintiffs argue that the Director defendants knowingly participated in a scheme that was against the interests of the Funds.

Bad faith, and thus a breach of the duty of loyalty, arises only when a fiduciary knowingly and completely fails to undertake their responsibilities. *Robotti & Co., LLC v. Liddell*, 2010 Del. Ch. Lexis 4, 44 (Del. Ch. 2010). While plaintiffs allege that the Director defendants knowingly participated in the UBS scheme to inflate and misstate the price of the ERS bonds, such allegation is conclusory at best. Plaintiffs have failed to allege any particularized facts that would allow this court to infer that the Director defendants knew that the price was

---

[16]Plaintiffs' complaint alleges that the "entire fairness" doctrine should apply to the ERS bonds transaction. When looking at conduct of a board, courts may use either the "business judgment rule" or the "entire fairness doctrine." The determination of which is applicable turns on whether the directors had a financial interest sufficient to render them incapable of exercising objective business judgment. *President and Fellows of Harvard College v. Glancy*, 2003 Del. Ch. Lexis 25, 66 (Del. Ch. 2003). While the court finds that plaintiffs have failed to adequately plead that the directors had a sufficient financial interest, the court makes no determination as to whether the "entire fairness doctrine" ultimately applies to the ERS bonds transaction.

inflated and that, which such knowledge, purchased the ERS bonds.  In fact, plaintiffs have failed to allege any facts regarding the Board of Directors' decision to purchase the ERS bonds, nor are there any facts establishing the self-interest promoted by the ERS bonds transaction.[17] The court has no way of knowing and evaluating the process through which the Director defendants made their decision and, as such, finds that plaintiffs have not raised a reasonable doubt as to whether the Director defendants' decision to purchase the ERS bonds was a valid business judgment.

### c.        Duty of Care

Plaintiffs next allege that the Director defendants failed to adequately inform themselves about the details of and circumstances surrounding the ERS bonds transaction and thereby violated their duty of care.  **ECF No. 1** at ¶ 112.  Such intentional disregard of their duty to inform themselves creates a reasonable doubt as to whether the Director defendants' decision to purchase the ERS bonds was a valid business judgment.

Again, plaintiffs' complaint completely fails to provide the court with particularized facts supporting this allegation.  As observed earlier, there are absolutely no allegations in the complaint that go to the Director defendants' process or procedure in considering the ERS bonds purchase.  *In re Citigroup Inc. S'holder Derivative Litig*, 964 A.2d 106, 122 (Del. 2009)(citing *In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959, 967-968 (Del. Ch. 1996). Plaintiffs' only allegation going to this point states, in full, "[t]he Director defendants did not adequately inform themselves about the details of and the circumstances surrounding the ERS Bond Transactions, including: (a) the true value of the ERS bonds; (b) the UBS Defendants' motive in pushing the bulk of the distribution onto its captive affiliates; (c) the advisability of assuming so large a position in the ERS Bonds; and (d) the suitability of the investment for the Funds."  **ECF No. 1** at 112.  There are no allegations stating that such information was readily available, nor are there any allegations illustrating the failings of the Director defendants' process of gathering information.  *See MCG Capital Corp.*, 2010 Del. Ch. Lexis 87 at 61 (finding

---

[17]Consistent with the court's prior determinations, plaintiffs' complaint fails to raise a reasonable doubt as to the interest of a majority of the individual Director defendants.

that second prong of *Aronson* had been established where complaint contained specific allegations dealing with the approval process); *Khanna*, 2006 Del. Ch. Lexis 86 at 104 (finding that second prong of *Aronson* had been established where complaint contained specific allegations that the "Covad Board had members with significant, material interests in the transaction, ignored a management that objected to the acquisition 'almost uniformly,' failed to evaluate management due diligence findings that expressed serious concerns about the transaction and knew of significant conflicts held by the investment banker rendering the fairness opinion on which the Board relied.").  As such, the court finds that plaintiffs have failed to allege sufficient facts to create a reasonable doubt that the Director defendants' decision regarding the ERS bonds was a valid business judgment.

### d.     ERS Bonds Transaction

Finally, plaintiffs argue that the size, timing and effect of ERS bonds transaction itself creates a reasonable doubt as to whether the decision of the Directors defendants was a valid business judgment.  **ECF No. 41** at 38-39.

First, the cases cited in support of plaintiffs' arguments are inapposite to the facts in the case at bar.  In *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007),  in finding that the transaction itself created reasonable doubt, the court specifically noted that the board made a decision in contravention of the explicit terms of the stock option plans.  Plaintiffs point to no explicitly illegal or incorrect decision of the Director defendants.  While plaintiffs attempt to argue, by analogy, that the ERS bonds transaction was presumptively in bad faith pursuant to the Investment Company Act, they also admit that such Act does not apply to Puerto Rico.  **ECF No. 41** at 39.  The Director defendants' decision cannot be measured by rules that are not applicable to them.

Moreover, while plaintiffs allege that the timing of the purchases and the impact of the purchases allow this court to infer bad faith, this is exactly the type of hindsight analysis courts should avoid.  *In re Citigroup Inc. S'holder Derivative Litig*, 964 A.2d 106, 122 (Del. 2009) (citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967-968 (Del. Ch. 1996))("[C]ompliance with a director's duty of care can never appropriately be judicially determined by reference to the content of the board decision that leads to a corporate loss. .

. That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests."). Inasmuch as plaintiffs have alleged no facts regarding the process of the Board of Directors' decision, this court cannot find that the ERS bonds transaction itself creates a reasonable doubt as to whether the decision was a valid business judgment.

Having disposed of all of plaintiffs' arguments, the court finds that plaintiffs have not met the second prong of *Aronson.* Accordingly, defendants' motion to dismiss the derivative claims is **GRANTED**. Plaintiffs' derivative claims are **DISMISSED**.

### B.      Failure to State a Claim

UBS defendants and Director defendants also argue that all of plaintiffs' class ation claims should be dismissed for failure to state a claim for which relief can be granted.[18] Plaintiffs assert two class actions claims: Count IV - Class Claim for Breach of ERISA Fiduciary Duties against the UBS Defendants and Count VI - Class Claims for Violations of Duty to Act in Good Faith against the UBS Defendants. **ECF No. 1** at 164-173, 182-184. The court looks at each claim separately.

#### 1.      Breach of ERISA Fiduciary Duties

While plaintiffs do not specify as much, the court understands plaintiffs' claims are brought pursuant to 29 U.S.C. § 1132(a)(2), which states, "[a] civil action may be brought– by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409." Section 409 of ERISA, 29 U.S.C.S. § 1109 states, "[a]ny person who is a fiduciary with respect to a  plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach. . . ."

In the present case, plaintiffs allege that the UBS defendants are fiduciaries of PRSSA

---

[18]Since the court has already dismissed plaintiffs' derivative claims pursuant to Rule 23.1(b), the court goes no further in its analysis regarding the derivative claims - as such, this court makes no determination as to the viability of plaintiffs' derivative claims.

and, therefore, are liable for the alleged violations of fiduciary duties.  UBS defendants and Director defendants argue that the UBS defendants are not fiduciaries of PRSSA and, therefore, the claim must be dismissed.

The ERISA statue provides for two different types of fiduciaries: a "functional fiduciary" and a "named fiduciary."  A "named fiduciary" is one who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary by a person who in an employer or employee organization with respect to the plan or by such an employer and such an employee organization acting jointly.  29 U.S.C. §1102(a)(2).   A "functional fiduciary" is "a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plans."  29 U.S.C. §1002 (21) ("Rule 1002(21)").

The above is further qualified by the Department of Labor's specifications in which a person rendering investment advice is further defined as one who renders advice to the plan as to value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing or selling securities or other property; and such person has discretionary authority or control, with respect to purchasing or selling securities or other property for the plan or renders such advice on a regular basis to the plan.  29 C.F.R. 2510.3-21.[19]   As is demonstrated by the specific definition, the focus of the functional fiduciary

---

[19]29 C.F.R. 2510.3-21 states, in full, "A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within he meaning of section 3(21)(A)(ii) of the Employee Retirement Income Security Act of 1972 (the Act) and this paragraph, only if: (i) Such person renders advice to the plan as to the value of securities or other property, or makes recommendations as to the advisability of investment in, purchasing or selling securities or other property; and (ii) Such person either directly or indirectly (e.g., through or together with an affiliate) – (A) Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or (B) Renders any advice described in paragraph (c)(1)(I) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such

inquiry is on the actual duties and tasks being performed and their relation to the Plan. *Livick v. The Gillette Co.*, 524 F.3d 24, 29 (1st Cir. 2008)( the question of fiduciary status comes down to whether "the person was acting as a fiduciary, that is, was performing a fiduciary function, when taking the action subject to complaint."); *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 18 (1st Cir.).

It is undisputed neither of the UBS defendants are a named fiduciary. Thus, the court must determine whether plaintiffs have adequately alleged UBS defendants as functional fiduciaries. Ultimately, as the court reads the complaint, plaintiffs allege that UBS defendants are fiduciaries to PRSSA because PRSSA has purchased shares in the Funds which are managed by UBS Trust, and UBS PR as its alter ego.[20] Thus, the discretionary authority and

_____

person and the plan or a fiduciary with respect to the plan, that such service will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments."

[20]The court's summary of plaintiffs' argument is based, mainly, on the following allegations within the complaint:

27.    UBS Trust acts as the issuing, paying and transfer agent of the Funds. . . . UBS Trust manages the assets of the Funds throuhg its UBS Asset Managers division. Throughout the Relevant Period, UBS Trust derived substantial income from managing the Funds and from acting as investment advisor to certain shareholders of the Funds.

29.    UBS Trust and UBS Financial act as alter egos in their financial dealings in Puerto Rico. As alleged herein, they have substantial overlap in directorships and upper management, and otherwise disregard corporate distinctions in order to conduct their business.

46.    By reason of its position as asst manager and fund advisor for the Funds (through its UBS Asset Mangers Division), UBS Trust and its alter ego UBS Financial had various contractual obligations to the Funds.

71.    . . . UBS Trust, who was charged with ensuring that the Funds purchased suitable and appropriate investments, purchased over $750 million of these low grade high risk pension bonds for the Funds that it managed, the shares of which were held or purchased by Plaintiffs and other members of the Class.

130.    Defendants are fiduciaries of any ERISA plans that invested in the Funds, including Plaintiff UDEM PRSSA, pursuant to ERISA §§ 409 and 502, 29 U.SC. §§ 1109 and 1132.

134.    Consequently, in light of the foregoing duties, responsibilities, and actions, Defendants were *de facto* fiduciaries of ERISA plan Class members, including UDEM PRSSA, withing the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that the Defendants exercised discretionary authority or discretionary control respecting management of ERISA monies in Funds II, III, IV, exercised authority or control respecting management or disposition of the assets of Funds II, III and IV and/or discretionary authority or discretionary responsibility in the administration of the ERISA monies in Funds II, III, and IV.

control UBS defendants allegedly exert relates to the ERISA monies invested in the Funds via the purchase of shares.  Plaintiffs make no claim that UBS defendants provide any investment advice or services to PRSSA directly, the only connection between the two parties are the Funds which UBS defendants allegedly managed and in which PRSSA has purchased shares.

The court finds that plaintiffs' allegations do not sufficiently allege that UBS defendants are fiduciaries of PRSSA.  First, UBS Trust's management of the Funds does not function as rendering investment advice, either directly or indirectly, to PRSSA.  As the Department of Labor has specified, in order to qualify as a fiduciary under this prong of Rule 1002(21) one must render advice to the plan itself - advice or management of the funds in which the plan invests is not encompassed by the definition.  *See supra* n. 19 ("A person shall be deemed to be rendering "investment advice" to an employee benefit plan . . .  only if: (I) Such person renders advice to the plan . . . and (ii) Such person either directly or indirectly . . . (A) Has discretionary authority or control, . . . for the plan; or (B) Renders any advice described in paragraph (c)(1)(I) of this section on a regular basis to the plan. . . ").

Similarly, the court finds that plaintiffs' argument that UBS Trust has authority or control over PRSSA's assets because they  manage Funds in which PRSSA purchased shares is too attenuated of a string upon which to hang fiduciary liability.  While the statutory language does state a person is a functional fiduciary if they exercise any authority or control over Plan assets, the court does not read such as intending only a  minimal level of control to establish fiduciary status.  *Finkel v. Romanowicz*, 577 F.3d 79 (2nd Cir. 2009)("Although we have recognized that Congress intended ERISA's definition of fiduciary to be broadly construed, we have also concluded that "management or disposition" of ERISA plan assets refers to the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on.")(citations omitted).  Thus, it is not clear that UBS defendants actually would have been able to assert any control over the ERISA monies invested in the Funds - UBS Trust could not control the amount invested or whether the shares would be retained or sold.

In light of the above, the court finds that plaintiffs have failed to allege that UBS defendants are functional fiduciaries.  Our conclusion is further supported by holdings in

other courts dealing with similar factual scenarios and finding that the entity was not a fiduciary. *In re Mut. Funds Inv. Litig.*, 403 F. Supp. 2d 434, 447 (D. Md. 2005 )("The defendants are correct that providing investment services to the underlying mutual funds would not make an entity a fiduciary for any retirement plan that simply invests in those funds."); *Walsh v. Marsh & McLennan Cos.*, 2006 U.S. Dist. Lexis 12020, *9 (D. Md. 2006 )("Investment Trusts and Putnam Investments are not named fiduciaries. They both provided investment services to the mutual funds included within the Plan, but that is not a fiduciary function.").

Accordingly, defendants' motion to dismiss the class action claim for breach of ERISA fiduciary duties is **GRANTED**.

### 2.       Violations of Duty to Act in Good Faith

Plaintiff AP brings the second class action claim alleging that the UBS Defendants "throughout the Class Period clearly and expressly demonstrated a lack and complete absence of any basic good faith principles or compliance with fair dealing standards in fulfilling their contractual obligations to Plaintiff UDEM AP and the Class, including the contractual obligations arising from Plaintiff UDEM AP and the Class' investments in the Funds." **ECF No. 1** at ¶ 184.

However, the court is unable to find a single allegation regarding the existence of a contract or contractual obligations between plaintiff AP and UBS Defendants. While the complaint contains allegations regarding a contract[21] between UBS Trust and the Funds and

---

[21]The court notes that the following allegations from the complaint explicitly refer to a contract:

6.       Advisory agreements with each of the Funds (the "Advisory Agreements") provide that UBS Asset Managers is entitled to receive annual investment advisory fees in the amount of .75% of the Funds' average weekly gross assets. Separate contracts with each of the Funds ("Administration Agreements") provide that UBS Trust is entitled to receive annual administrative fees in the amount of .15% of the Funds' average weekly gross assets.

46.       By reason of its position as asset manager and fund advisor for the Funds (through its UBS Asset managers Division), UBS Trust and its alter ego UBS Financial had various contractual obligations to the Funds. In performing those contractual duties, the UBS defendants were required to act in good faith and in a loyal, honest and fair manner. This good faith obligation required the UBS defendants to faithfully comply with the representations and agreements reached with the Funds and not to defraud or abuse the trust given to them by the Funds

discusses UBS defendants' contractual obligations[22] to the Funds, there is nothing that establishes the source of any contractual obligations owed by the UBS defendants to AP.

Inasmuch as plaintiffs' claim is a contractual claim without any allegations of a contract existing between UBS defendants and AP, there is not basis for an implied covenant of good faith and fair dealing and the court must dismiss the claim. (*Platten v. HG Berm. Exempted Ltd.*, 437 F.3d 118, 129-130 (1st Cir. 2006 )("Having concluded that no contract exists, there can be no derivative implied covenant of good faith and fair dealing applicable to these parties.").  Defendants' motion to dismiss plaintiff AP's class action claim is **GRANTED.**

### C.      Supplemental Claim

Plaintiffs' sole remaining claim is Count XI, entitled "Supplemental Jurisdiction under 28 USC § 1367 and Attorneys Fees and Prejudgment Interest."  As best as the court can tell, the claim seems to be one for attorneys' fees, costs as well as pre-judgment and postjudgment interest pursuant to Commonwealth law.  Since all of plaintiffs' claims have been dismissed, the court declines to exercise supplemental jurisdiction to adjudicate this claim.  Defendants' motion to dismiss is **GRANTED**.

## IV.   Conclusion

Based on the foregoing, defendants' Motion to Dismiss at **Docket No. 35** is **GRANTED**.  Plaintiffs' complaint is **DISMISSED WITHOUT PREJUDICE**.  Clerk of Court is to enter judgment accordingly

**SO ORDERED.**

At San Juan, Puerto Rico, this 31st day of March, 2011.

S/**AIDA M. DELGADO-COLON**
**United States District Judge**

---

[22]The court notes that the following allegations from the complaint refer to "contractual obligations":

66.      Because of the statutory and contractual duties described above, defendants were required to manage the Funds' investments solely in the interest of the Funds and its shareholders.

82.      Throughout the Relevant Period, the Funds justifiably expected the defendants, who were fiduciaries of and/or had contractual obligations to the Funds, to disclose material information as required by law. . . .

128.     By reason fo the sale of shares of the Funds to members of the Class and their position as asset manager and fund advisor for the Funds, the UBS defendants had various contractual obligations to the Funds.  In performing those contractual duties, the UBS defendants were required to act in good faith and in a loyal, honest and fair manner.