# United States Court of Appeals
## For the First Circuit

---

No. 11-1605

UNIÓN DE EMPLEADOS DE MUELLES DE PUERTO RICO PRSSA WELFARE PLAN, individually and on behalf of all others similarly situated, and derivatively on behalf of PUERTO RICO FIXED INCOME FUND II, INC., PUERTO RICO FIXED INCOME FUND III, INC., PUERTO RICO FIXED INCOME FUND IV, INC., and TAX-FREE PUERTO RICO FUND II, INC., UNIÓN DE EMPLEADOS DE MUELLES DE PUERTO RICO AP WELFARE PLAN, individually and on behalf of all others similarly situated, and derivatively on behalf of PUERTO RICO FIXED INCOME FUND II, INC., PUERTO RICO FIXED INCOME FUND III, INC., PUERTO RICO FIXED INCOME FUND IV, INC., and TAX-FREE PUERTO RICO FUND II, INC.,

Plaintiffs, Appellants,

v.

UBS FINANCIAL SERVICES INC. OF PUERTO RICO; UBS TRUST COMPANY OF PUERTO RICO; MIGUEL A. FERRER; CARLOS V. UBIÑAS; STEPHEN C. ROUSSIN; LESLIE HIGHLEY, JR.; MARIO S. BELAVAL; AGUSTÍN CABRER-ROIG; GABRIEL DOLAGARAY-BALADO; CARLOS NIDO; LUIS M. PELLOT-GONZÁLEZ; VICENTE J. LEÓN; CLOTILDE PÉREZ; DOES 1 THROUGH 100,

Defendants, Appellees,

v.

PUERTO RICO FIXED INCOME FUND II, INC.; PUERTO RICO FIXED INCOME FUND III, INC.; PUERTO RICO FIXED INCOME FUND IV, INC.; TAX-FREE PUERTO RICO FUND II, INC.,

Nominal Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

---

Before

Howard, Lipez, and Thompson,
<u>Circuit Judges</u>.

———————————

<u>Jay W. Eisenhofer</u>, with whom <u>Mary S. Thomas</u>, <u>Cynthia A. Calder</u>, <u>Grant & Eisenhofer P.A.</u>, <u>Harold D. Vicente-Gonzalez</u>, <u>Harold D. Vicente-Colon</u>, <u>Vicente & Cuebas</u>, <u>Douglas R. Hirsch</u>, <u>Charles H. Dufresne, Jr.</u>, <u>Sadis & Goldberg LLP</u>, <u>Mark C. Gardy</u>, <u>James S. Notis</u>, <u>Kelly A. Noto</u>, and <u>Gardy & Notis, LLP</u> were on brief, for appellant.
<u>Paul J. Lockwood</u>, with whom <u>Nicole A. DiSalvo</u>, <u>Skadden, Arps, Slate, Meagher & Flom LLP</u>, <u>Salvador J. Antonetti-Stutts</u>, <u>Mauricio O. Muñiz-Luciano</u>, <u>Ubaldo M. Fernández-Barrera</u>, and <u>O'Neill & Borges</u> were on brief, for appellees UBS Financial Services Inc. of Puerto Rico, UBS Trust Company of Puerto Rico, Miguel A. Ferrer, Carlos V. Ubiñas, Stephen C. Roussin, and Leslie Highley, Jr.
<u>Rafael Escalera Rodríguez</u>, <u>Pedro Santiago</u>, and <u>Reichard & Escalera</u> on brief for appellees Mario S. Belaval, Agustín Cabrer-Roig, Gabriel Dolagaray-Balado, Carlos Nido, Luis M. Pellot-González, Vicente J. León, and Clotilde Pérez.
<u>Jose C. Sánchez-Castro</u> and <u>Pirillo Hill González & Sánchez PSC</u> on brief for nominal defendants.

———————————

January 4, 2013

———————————

LIPEZ, **Circuit Judge**.   A shareholder derivative action permits a shareholder of a corporation to bring suit to enforce rights the corporation is unable or unwilling to enforce on its own behalf.  See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991).  However, to prevent abuse of this procedural device, a shareholder seeking to assert a cause of action belonging to the corporation must state with particularity in the complaint either that the corporation declined to protect its own interests after suitable demand was made on the board of directors or that such a demand would have been futile.  See Gonzalez Turul v. Rogatol Distribs., Inc., 951 F.2d 1, 2 (1st Cir. 1991).  This case raises important questions concerning the circumstances in which, under the applicable law, a presuit demand is considered futile.

Plaintiff-Appellants Unión de Empleados de Muelles de Puerto Rico AP Welfare Plan ("AP") and Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan ("PRSSA") are Puerto Rico pension plans that own shares in closed-end investment funds ("the Funds") advised by UBS Trust Company of Puerto Rico ("UBS Trust"), a subsidiary of the Swiss financial giant UBS AG.  In 2008, UBS Trust, acting as the Funds' investment adviser, purchased approximately $757 million worth of bonds from a series of issuances underwritten by UBS Financial Services Incorporated of Puerto Rico ("UBS Financial"), another UBS AG affiliate, and then sold these bonds to the Funds.  As a consequence, the Funds were so

-3-

heavily invested in these bonds that they suffered significant losses when the value of these bonds soon depreciated.

Plaintiffs brought a shareholder derivative action in federal district court against the Funds' directors, UBS Trust, and UBS Financial, who jointly filed a motion to dismiss plaintiffs' claims.  The district court granted the motion to dismiss on the ground that no presuit demand had been made on the Funds' boards of directors, and plaintiffs had failed in their complaint to state with particularity the reasons such a demand would have been futile.  After careful consideration, we vacate the dismissal of the derivative claims and remand for further proceedings.

## I.

The following facts, which we take as true, are drawn from the allegations in the complaint.  See In re Sonus Networks, Inc., 499 F.3d 47, 66 (1st Cir. 2007).

Plaintiff AP owns shares of four investment funds: the Puerto Rico Fixed Income Fund II, Inc. ("Fund II"), the Puerto Rico Fixed Income Fund III, Inc. ("Fund III"), the Puerto Rico Fixed Income Fund IV, Inc. ("Fund IV"), and the Tax-Free Puerto Rico Fund II, Inc. ("Tax-Free Fund").  Plaintiff PRSSA owns shares of Fund II, Fund III, and Fund IV.  Though these four funds are separate investment companies, the board of directors for each fund has an

identical composition.[1] We refer to these four funds collectively as the "Funds."

Each of the Funds is a closed-end fund, and is incorporated under the laws of Puerto Rico.[2] Generally, such funds fall under the purview of the Investment Company Act of 1940 ("the 40 Act"). The funds in this case, however, are unusual in that they are exempt from the 40 Act under section 6(a)(1), which provides an exemption for certain funds organized in Puerto Rico, so long as securities issued by that fund are sold only to residents of Puerto Rico. See 15 U.S.C. § 80a-6(a)(1). To ensure that shares of these exempt funds are sold only to residents of Puerto Rico, the securities they issue contain special restrictions on how and to whom shares of these funds can be transferred or sold. As a consequence, the pool of potential buyers for these funds is smaller than the pool available to a typical large, closed-end mutual fund.

UBS Trust, through its UBS Asset Managers Division, serves as the investment adviser and administrator for the Funds.

---

[1] "Unlike other corporations, investment companies are typically created and managed by pre-existing entities known as investment advisers." Verkouteren v. Blackrock Fin. Mgmt. Inc., 37 F. Supp. 2d 256, 258 (S.D.N.Y. 1999)

[2] A closed-end fund is "[a] mutual fund having a fixed number of shares that are traded on a major securities exchange or an over-the-counter market." Black's Law Dictionary 1116 (9th ed. 2009).

As compensation for these services, UBS Trust is entitled to an annual administrative fee of .15% and an advisory fee of .75%, of the average weekly gross assets of the Funds.

UBS Trust is an affiliate of, and shares officers with, UBS Financial, a broker-dealer registered with the Securities and Exchange Commission ("SEC").  Since 2007, UBS Financial has served as a financial adviser to Puerto Rico's troubled Employee Retirement System ("ERS"), which is a public retirement system maintained by the government of Puerto Rico for its 278,000 retirees and employees.

During the first half of 2008, UBS Financial underwrote $2.9 billion of bonds issued by ERS.  Because an underwriter buys bonds from an issuer and resells them to investors, with the difference between the purchase price paid by the underwriter to the issuer and the resale price accounting for the underwriter's profit or loss, see John P. Lucas, Pruning the Antitrust Tree: Credit Suisse Securities (USA) LLC v. Billing and the Immunization of the Securities Industry from Antitrust Liability, 59 Mercer L. Rev. 803, 804 (2008); see also In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 400-401 (S.D.N.Y. 2007) (defining "underwriter" for purposes of the Securities Act of 1933), UBS Financial's profits from these offerings were contingent upon finding investors willing to buy the ERS bonds at a premium above the price UBS Financial had paid ERS.

The ERS bonds were offered for purchase in three series: Series A in January 2008; Series B in May 2008; and Series C in June 2008. When there was little global interest in the Series A offering of the ERS bonds, ERS and UBS Financial abandoned their initial plans to offer Series B outside of the Puerto Rico market. Nevertheless, UBS Trust purchased nearly $1.5 billion worth of the ERS bonds from UBS Financial and then resold them to the funds it advises, with approximately $757 million worth of the bonds sold to the Funds at issue in this case. Not only did UBS Trust purchase more than half of the entire multi-billion dollar offerings, UBS Trust purchased nearly $850 million, or 85%, of the Series B bonds. As a result of these purchases, the ERS bonds accounted for more than thirty percent of the assets of Funds II, III, and IV and approximately fifteen percent of Tax-Free Fund II.[3]  For its role in bringing the bonds to market, UBS Financial shared in underwriters' fees of $27 million.[4]

Within one year of issuance, the ERS bonds lost ten percent of their value, dragging down the worth of the Funds.  In response, and without first demanding corrective action from the

---

[3] To summarize the travel of the bonds: ERS sold the bonds to its underwriter, UBS Financial, which in turn sold them to UBS Trust and other buyers. UBS Trust then sold the bonds it had purchased to the funds it advises, including the Funds at issue in this case. Plaintiffs in this case are institutional investors in the Funds.

[4] The complaint does not indicate who the other underwriters were or what percentage of the total fees UBS Financial received.

Funds' boards of directors, plaintiffs filed a shareholder derivative suit in February 2010 in federal district court against the Funds' directors, UBS Trust, and UBS Financial. The complaint alleged that the institutional defendants engaged in a scheme of manipulative trading whereby they used the Funds to manufacture the appearance of market interest in the bonds and drive up the price other investors were willing to pay for them. Plaintiffs asserted derivative claims under Rule 10-b5 and Section 10(b) of the Exchange Act against UBS Trust and UBS Financial, derivative claims under Section 20(a) of the Exchange Act against certain directors individually, and derivative claims under Section 12(a)(2) of the Securities Act against UBS Trust and UBS Financial.[5] The complaint also stated that a presuit demand would have been futile.

Appellees moved to dismiss the derivative claims on the ground that plaintiffs had inadequately pleaded demand futility. In opposing the motion to dismiss, plaintiffs requested an opportunity to cure any deficiencies in the complaint by filing an amended complaint if the district court were inclined to dismiss any or all of their claims.

---

[5] In addition to their derivative claims, plaintiffs asserted direct claims against UBS Trust and UBS Financial on behalf of a putative class of shareholders for breach of ERISA fiduciary duties and violations of the duty of good faith. These direct claims were dismissed by the district court pursuant to Federal Rule of Civil Procedure 12(b)(6). Their dismissal is not challenged on appeal.

-8-

The district court did not afford plaintiffs any such opportunity.  Instead, it dismissed plaintiffs' derivative claims without prejudice for failure to properly plead demand futility. When plaintiffs sought leave to file an amended complaint, the district court denied plaintiffs' motion, citing our holding in Fisher v. Kadant, Inc. that "once judgment has entered, the case is a dead letter, and the district court is without power to allow an amendment to the complaint because there is no complaint left to amend."  589 F.3d 505, 509 (1st Cir. 2009).  This appeal followed, challenging both the dismissal of plaintiffs' derivative claims and the denial of their motion to amend.

## II.

We must address a threshold question in this case about the standard of review that applies to a district court's dismissal of a shareholder derivative action based on a failure to properly plead demand futility.  Our decisions have left this question open. See, e.g., Gonzalez Turul, 951 F.2d at 1, 3 (holding that district court should have dismissed derivative suit but not discussing standard of review); In re Kauffman Mut. Fund Actions, 479 F.2d 257, 263, 267 (1st Cir. 1973) (affirming dismissal of derivative suit without describing standard of review).  The closest we have come to setting forth the applicable standard of review was in Heit v. Baird, where we noted that the district court had not "abused its discretion" in dismissing a shareholder derivative action.  567

-9-

F.2d 1157, 1161 (1st Cir. 1977).  However, we also determined for ourselves in Heit that the pleadings were inadequate without any discernible deference to the district court's conclusions, and our holding said only that dismissal of the case was "proper," id. at 1162, appearing to abjure a more deferential standard of review. Our view that Heit did not establish the governing standard in this circuit is confirmed by the conspicuous absence in our subsequent decisions of any statement to that effect.  See Gonzalez Turul, 951 F.2d at 2 (citing Heit but no mention of standard of review); Marquis Theatre Corp. v. Condado Mini Cinema, 846 F.2d 86, 90-91 (1st Cir. 1988) (same); Grossman v. Johnson, 674 F.2d 115, 123 (1st Cir. 1982) (same); Untermeyer v. Fid. Daily Income Trust, 580 F.2d 22, 23 (1st Cir. 1978) (same).

        Other courts of appeals have traditionally reviewed the dismissal of a derivative suit based on a failure to properly plead demand futility for abuse of discretion.  See, e.g., Potter v. Hughes, 546 F.3d 1051, 1056 (9th Cir. 2008); Kanter v. Barella, 489 F.3d 170, 175 (3d Cir. 2007).  Recently, however, there have been expressions of skepticism regarding the appropriateness of this standard from the Second Circuit, see Kautz v. Sugarman, 456 F. App'x 16, 18 (2d Cir. 2011); Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 137 n.6 (2d Cir. 2004), the Ninth Circuit, see Israni v. Bittman, 473 F. App'x 548, 550 n.1(9th Cir. 2012); Laborers Int'l Union of N. Am. v. Bailey, 310 F. App'x 128, 130 n.1 (9th Cir.

2009), and the D.C. Circuit, <u>see</u> <u>Pirelli Armstrong Tire Corp.</u> <u>Retiree Med. Benefits Trust</u> v. <u>Raines</u>, 534 F.3d 779, 783 n.2 (D.C. Cir. 2008). As the Second Circuit has observed, the abuse of discretion standard is incongruous in this context: "[W]hen a trial court rules on the legal sufficiency of a complaint the question presented should be one of law. When an appellate court reviews such a ruling, review should be de novo." <u>Scalisi</u>, 380 F.3d at 137 n.6.

State courts have trended even more strongly toward plenary review. In 2000, the Delaware Supreme Court expressly adopted a de novo standard of review, explaining that the nature of its analysis of a complaint in a derivative suit is no different than that of a lower court. <u>See</u> <u>Brehm</u> v. <u>Eisner</u>, 746 A.2d 244, 253-54 (Del. 2000). The highest courts of other states have followed suit. <u>See</u> <u>Fink</u> v. <u>Codey</u> (<u>In re PSE & G S'holder Litig.</u>), 801 A.2d 295, 313 (N.J. 2002); <u>Harhen</u> v. <u>Brown</u>, 730 N.E.2d 859, 866 (Mass. 2000) (same).

We are persuaded by the reasoning in these cases. As a general matter, rulings concerning the legal sufficiency of pleadings are reviewed de novo. <u>See</u> <u>Giragosian</u> v. <u>Ryan</u>, 547 F.3d 59, 63 (1st Cir. 2008). There is no justification for treating the pleadings in a derivative suit differently. A district court is no better positioned than we are to read and evaluate a complaint in this sort of action. <u>See</u> <u>Brehm</u>, 746 A.2d at 253-54. Accordingly,

we now hold that a district court's dismissal of a shareholder derivative suit based on a failure to properly plead demand futility is subject to de novo review.

## III.

Federal Rule of Civil Procedure 23.1 sets forth the rule of pleading requiring a shareholder filing a derivative action to allege with particularity either that a satisfactory presuit demand was presented to, and refused by, the board of directors or the reasons such a demand would have been futile. However, the circumstances in which a demand is required or, conversely, excused are determined by reference to the law of the state in which the corporation is incorporated. See Gonzalez Turul, 951 F.2d at 1 & n.3; cf. Kamen, 500 U.S. at 96-97 ("Rule 23.1 . . . does not create a demand requirement of any particular dimension."). That is, the federal rule merely requires that the complaint allege sufficient facts to enable a federal court to decide whether, as a matter of state substantive law, a presuit demand was necessary. See Halebian v. Berv, 590 F.3d 195, 211 (2d Cir. 2009).

Because the Funds are Puerto Rico corporations, Puerto Rico law ordinarily would inform our analysis as to whether a demand was excused in this case. However, Puerto Rico law "does not specifically elaborate the requirements of demand or when it is excused." Gonzalez Turul, 951 F.2d at 3 n.4. Hence, we look to

Delaware corporate law, on which Puerto Rico corporate law is modeled.  See id.; Marquis Theatre, 846 F.2d at 91.

Through its opinions in Aronson v. Lewis, 473 A.2d 805 (Del. 1984), overruled on other grounds by Brehm, 746 A.2d at 253-54, and Rales v. Blasband, 634 A.2d 927 (Del. 1993), the Delaware Supreme Court has established two interrelated tests for demand futility. "In simple terms, these tests permit a corporation to terminate a derivative suit if its board is comprised of directors who can impartially consider a demand." In re Oracle Corp. Deriv. Litig., 824 A.2d 917, 939 (Del. Ch. 2003). Which test is appropriate in a given case depends on the nature of the plaintiff's allegations against the board: Rales applies where the plaintiff challenges a board's failure to discharge its oversight duties, while Aronson applies where the plaintiff alleges that the board as a whole has made a conscious business decision in violation of its fiduciary duties.  See Rales, 634 A.2d at 933 ("The essential predicate for the Aronson test is the fact that a decision of the board of directors is being challenged in the derivative suit."); see also Wood v. Baum, 953 A.2d 136, 140 (Del. 2008) ("The Aronson test applies to claims involving a contested transaction."); In re Baxter Int'l, Inc. S'holders Litig., 654 A.2d 1268, 1269 (Del. Ch. 1995)(holding that Rales applies where plaintiffs "do not challenge directors' exercise of business judgment").

In the instant case, plaintiffs do not allege that the boards of each of the Funds made a formal, direct decision to purchase the ERS bonds. Rather, as is common practice, the directors delegated the authority to make investment decisions on behalf of the Funds to the investment adviser, here UBS Trust. Acting as investment adviser, UBS Trust then executed the purchases of ERS bonds from UBS Financial and placed them with the Funds. The Rales standard is thus the best fit for this case. See Rales, 634 A.3d at 933-34 (noting Aronson is inappropriate "where the subject of the derivative suit is not a business decision of the board"); In re Mut. Funds Inv. Litig., 384 F. Supp. 2d 873, 878 (D. Md. 2005)(applying Delaware law and concluding that Rales was more appropriate in the mutual fund context).

For a plaintiff to succeed under Rales, she must allege particularized facts creating "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Rales, 634 A.2d at 934. Applying this test, we look to the individual directors rather than the board as a whole, and excuse demand "only if a majority of the board members are interested or lack independence." In re Sonus Networks, 499 F.3d at 67 (citing Rales, 634 A.2d at 930). A director is interested "whenever divided loyalties are present, or where the director will receive a personal financial benefit from

a transaction that is not equally shared by the stockholders, or
when a corporate decision will have a 'materially detrimental
impact' on a director but not the corporation or its stockholders."
In re Verisign, Inc. Deriv. Litig., 531 F. Supp. 2d 1173, 1189
(N.D. Cal. 2007) (quoting Rales, 634 A.2d at 936).  Similarly, a
director's independence may be compromised if he or she is so
personally or financially beholden to an interested person, or an
interested entity, that "his or her discretion [is] sterilized."
Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845
A.2d 1040, 1050 (Del. 2004) (quoting Aronson, 473 A.2d at 816)
(internal quotation marks omitted); see also Orman v. Cullman, 794
A.2d 5, 25 n.50 (Del. Ch. 2002) (explaining that the independence
inquiry "involves an inquiry into whether the director's decision
resulted from that director being controlled by another"); Aronson,
473 A.2d at 816 ("Independence means that a director's decision is
based on the corporate merits of the subject before the board
rather than extraneous considerations or influences.").  Though
disinterest and independence are separate concepts, "similar
factual circumstances may implicate both interest and
independence." Orman, 794 A.2d at 25 n.50.

In evaluating the directors' disinterest and
independence, Delaware courts have understood Rales to signal a
kind of realism in analyzing the human dynamics at play in a
director's relationships. See Mizel v. Connelly, No. 16638, 1999 WL

-15-

550369, at *3 n.1 (Del Ch. Aug. 2, 1999) (describing the <u>Rales</u> standard as a "pragmatic, realist approach"); <u>Steiner</u> v. <u>Meyerson</u>, No. 13139, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995) ("Realism of the kind signaled by <u>Rales</u> requires one to acknowledge the possibility that a partner at a small law firm bringing in close to $1 million in revenues from a single client in one year may be sufficiently beholden to, or at least significantly influenced by, that client as to affect the independence of his judgment.").

Turning to the instant case, we find that the district court's analysis of whether plaintiffs had established demand futility was flawed in two significant ways. First, in analyzing each director, the district court focused too narrowly on whether plaintiffs had alleged that the individual directors received a financial benefit from the ERS bonds transaction. Alleging the receipt of a personal financial benefit is not the sine qua non of demand futility. Rather, <u>Rales</u> requires the trial court to analyze more broadly the facts alleged concerning the circumstances of each director to determine whether plaintiffs have created a reasonable doubt that the director could objectively evaluate demand "without regard for" inappropriate influences. <u>Aronson</u>, 473 A.2d at 815. In other words, the district court should have considered whether plaintiffs had pled facts sufficient to demonstrate that each director has such significant connections to the defendants,

whether personal, financial, or otherwise, that he could not "impartially consider [demand] without being influenced by improper considerations." <u>Rales</u>, 634 A.2d at 934.

Second, the district court misconstrued plaintiffs' burden of demonstrating that the benefits -- financial or otherwise -- that the individual directors received from their place in the constellation of relationships between UBS Financial and UBS Trust were of "subjective material significance" as required under <u>Orman</u>, 794 A.2d at 25 n.50. To demonstrate subjective materiality, plaintiffs in a shareholder derivative suit "need not [offer] conclusive evidence of the materiality," but they must "provide the Court with some particulars <u>from which it could reasonably be inferred</u> that [the director's] objective judgment would be impaired." <u>MCG Capital Corp.</u> v. <u>Maginn</u>, No. 4521-CC, 2010 WL 1782271, at *20 (Del Ch. May 3, 2010) (emphasis supplied). In reviewing the disinterest and independence of each individual director in this case, however, the district court repeatedly declined to make such reasonable inferences of materiality from the facts alleged by plaintiffs. For example, the district court concluded that the allegations that one director was CEO of both institutional defendants did not raise a reasonable doubt about his ability to independently evaluate demand in this case because these facts were insufficient to establish that these positions were "subjectively material." In looking for more conclusive evidence of

-17-

materiality, the court overstated the burden plaintiff bears, and ignored the type of information available to plaintiffs at the pleading stage. See Rales, 634 A.2d at 934 (reasoning that plaintiffs should not be saddled with an "extremely onerous burden to meet at the pleading stage without the benefit of discovery"). At best, plaintiffs can only plead the particular facts of each director's public circumstances. It is then up to the court to evaluate the facts alleged regarding each individual director in light of common sense and practical experience in drawing an inference of subjective materiality.

## IV.

With these errors in mind, we turn to the individual directors. As noted, each of the Funds is overseen by an identical eleven-member board of directors.   Thus, for plaintiffs to establish demand futility, the complaint must create a reasonable doubt that at least six of the directors were not disinterested and independent under the Rales standard at the time of filing. Because Delaware law requires a plaintiff pleading demand futility to "allege facts as to the interest and lack of independence of the individual members of that board," we examine the facts plead concerning each director separately. Orman, 794 A.2d at 22.[6]

---

[6] In our discussion of the individual directors, we rely on the facts alleged in the complaint. For the purposes of our demand futility analysis, we take these facts as true. See In re Verisign, Inc., 531 F. Supp. 2d at 1187.

-18-

## A.  The Individual Directors

### 1. Leslie Highley, Jr.[7]

We begin with the most straightforward case. Plaintiffs allege and defendants do not contest that Leslie Highley, Jr. is an insider with extensive ties to UBS AG affiliates. In addition to being a director of each Fund, Highley is an executive employee of both UBS Trust, where he is Managing Director and Executive Vice President, and UBS Financial, where he is Senior Vice President. For several years, Highley has also acted on behalf of UBS Trust as portfolio manager for several of the Funds. In other words, Highley is involved at a high level with both institutional defendants. The district court correctly held that these facts alone are sufficient to create a reasonable doubt that he could be disinterested and independent in evaluating plaintiffs' demand in this case. See Orman, 794 A.2d at 25 n.50.

---

[7] Four directors – Highley, Ferrer, Ubiñas, and Roussin – are defendants in this suit in their individual capacity for alleged violation of section 20(a) of the Exchange Act. Though this personal liability claim might seem strong support for the proposition that they could not evaluate demand with disinterest and independence, the Delaware Supreme Court noted in Aronson that "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors." 473 A.2d at 815.  Later decisions have interpreted Aronson to mean that only a "substantial likelihood of personal liability" is enough to establish demand futility. See, e.g., Wood, 953 A.2d at 141 n.11. Because we find there are significant alternative factual allegations to establish that a majority of the board was not independent and disinterested, we pass no judgment as to whether the allegations against the individual directors create a "substantial likelihood of personal liability."

-19-

**2. Miguel Ferrer**

Plaintiffs allege that Miguel Ferrer serves as both Chairman and President of the Board of Directors of each of the four Funds. At the time of the ERS bond offering, Ferrer was also the Chief Executive Officer of both UBS Trust and UBS Financial. Before the complaint was filed, Ferrer concluded his employment with both UBS Financial and UBS Trust, but he did not leave the UBS AG family. Instead, at the time the complaint was filed, Ferrer was the Chairman of yet another UBS-affiliated entity known as UBS International & Puerto Rico ("UBS International").

Though the district court was correct in its ultimate conclusion that plaintiffs had created a reasonable doubt about Ferrer's ability to objectively evaluate demand, it improperly considered Ferrer's circumstances at the time of the ERS bonds transaction. By contrast, Rales requires the court to consider the facts pleaded concerning each director's circumstances at the time the complaint was filed. See Rales, 634 A.2d at 933-34 ("[A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." (emphasis supplied)).

Considering only the facts alleged concerning Ferrer's circumstances at the time the complaint was filed, we conclude that plaintiffs have established a reasonable doubt that Ferrer could have exercised his "independent and disinterested business judgment in responding to a demand." Rales, 634 A.2d at 934. Even though Ferrer was no longer a full-time employee at UBS Trust and UBS Financial, his extensive past ties to both UBS Trust and UBS Financial are important factors in our analysis. See Krantz v. Fidelity Mgmt. & Research Co., 98 F. Supp. 2d 150, 156 (D. Mass. 2000) (citing with approval ten factors set out by the SEC relevant to determination of control over directors which included "former business associations between the director and the controlling person"); In re Trump Hotels S'Holder Deriv. Litig., Nos. 96 Civ. 7820, 8527, 2000 WL 1371317, at *9 (S.D.N.Y. Sept. 21, 2000) ("[Director's] history of personally beneficial affiliation with Trump-controlled entities . . . diminishes the possibility that [he] had only the corporation's interests in mind when evaluating the transaction."). In particular, Ferrer's ability to leave his former UBS positions and assume a new role at a different UBS affiliate suggests that Ferrer has been able to leverage the relationships and goodwill he has built in the UBS family of companies into advancing his career. Given this history, we agree with the district court that plaintiffs have established a reasonable doubt that Ferrer could objectively evaluate the demand.

### 3.  Carlos Ubiñas

According to the facts alleged in plaintiffs' complaint, Carlos Ubiñas is Vice Chairman of the Board of Directors and Executive Vice President of each of the Funds. Like Highley and Ferrer, Ubiñas serves in multiple executive positions at UBS AG affiliates. Since 2005, Ubiñas has been the President of UBS Financial, the institutional defendant that received substantial remuneration for its services as a financial advisor to ERS and shared in $27 million in underwriting fees for its role as lead underwriter for the $2.9 billion bond offering at the heart of this dispute. He is also currently the CEO of UBS International, the same UBS AG affiliate where his fellow director Ferrer is Chairman.

As both president of defendant UBS Financial and a director of each Fund, Ubiñas's loyalties would necessarily be divided in evaluating plaintiffs' demand between his obligations to the Funds and his obligations to UBS Financial. See In re Verisign, Inc., 531 F. Supp. 2d at 1189 ("Directorial 'interest' exists whenever divided loyalties are present. . . ."). Similarly, as President of UBS Financial and CEO of another UBS AG affiliate, Ubiñas is beholden to the UBS defendants. See In re NutriSystem, Inc. Deriv. Litig., 666 F. Supp. 2d 501, 515 (E.D. Pa. 2009) ("Delaware courts have found that directors . . . lack independence because of their substantial interest in retaining their employment."); In re The Student Loan Corp. Deriv. Litig., 2002 WL

75479, at *3 & n.3 (concluding that directors who "owe their livelihood" to institutional defendant could not consider demand without "ponder[ing] the effect affirmative action on a demand would have on [their] future"); see also Rales, 634 A.2d at 937; Mizel, 1999 WL 550369, at *3 (finding directors lacked independence where they could not "consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment").

The district court concluded that these facts were insufficient to establish a reasonable doubt that Ubiñas could evaluate demand objectively.  We disagree.  Viewing the facts alleged concerning Ubiñas's circumstances as a whole, we conclude that plaintiffs have created a reasonable doubt that Ubiñas could "impartially consider [the] merits" of bringing a lawsuit alleging that his employer, UBS Financial, engaged in an unlawful scheme "without being influenced by improper considerations." Rales, 634 A.2d at 934.

## 4. Stephen Roussin

Like Ubiñas, Stephen Roussin is a Director of each of the Funds and a full-time employee of UBS Financial, where he is the Managing Director. For the same reasons discussed in relation to Ubiñas, we conclude that plaintiffs have plead sufficient facts to raise a reasonable doubt as to Roussin's independence and disinterest in evaluating the demand.

**5. Mario Belaval**

According to the allegations in plaintiffs' complaint, Mario Belaval's principal employer is Triple S, the largest managed care company in Puerto Rico, where Belaval is Vice Chairman. Belaval is also a director of twenty-three UBS-affiliated funds, including the four Funds at issue in this case. In the recent past, Triple S has enjoyed a lucrative relationship with UBS Financial and UBS Trust. In fact, in 2006, with the help of UBS Trust and UBS Financial, Triple S engaged in a transaction similar to the ERS bonds offering at issue in this case. In the 2006 transaction, UBS Financial served as the placement agent for a $35 million bond offering from Triple S. UBS Trust purchased this entire offering, and then re-sold the notes to several of the funds it advises, including Fund IV. In other words, Belaval is an officer of a company that benefitted significantly from the same affiliation that is at the heart of this case, using UBS Financial to sell Puerto Rican securities to UBS Trust for resale to its exempt funds. Plaintiffs allege that Triple S's previous use of the relationship between UBS Financial and UBS Trust gives Belaval "reason to discourage scrutiny of any similar related-party transactions, such as the purchase of the ERS Bonds."

In addition to Belaval's prior reliance on UBS Trust and UBS Financial to raise capital, plaintiffs allege that by remaining in the good graces of UBS affiliates, Belaval would receive

benefits including "opportunities to use UBS captive funds to support [his] other business ventures." These opportunities are particularly valuable to businesses in Puerto Rico because UBS Trust is "the largest asset manager" in Puerto Rico, and UBS Trust and its "alter ego" UBS Financial "are an unusually pervasive force in Puerto Rico's financial markets."

        In deciding that plaintiffs had not established a reasonable doubt about Belaval's independence, the district court failed to consider the facts alleged as a whole about Belaval's relationships with the institutional defendants. See In re Trump Hotels, 2000 WL 1371317, at *9 (noting that while one allegation standing alone "is insufficient to raise a reasonable doubt[,] . . . the totality of the circumstances raises a reasonable doubt" as to the director's independence). The district court should have considered Belaval's previous professional relationships with both institutional defendants and the possibility that Belaval will need the assistance of the UBS defendants in the future as a constellation of facts which, considered together, create a reasonable doubt about Belaval's independence. See, e.g., id. at *8 ("Courts have considered the possibility of future influence or remuneration as a factor when weighing director independence."); Krantz, 98 F. Supp. 2d at 156 (listing factors relevant to determining whether a director is controlled including "former

business associations between the director and the controlling person").

Similarly, the district court incorrectly dismissed plaintiffs' characterization of Belaval's entanglements with the institutional defendants as "conclusory allegations," and failed to make reasonable, common sense inferences from the facts alleged in the complaint. See In re Oracle Corp., 824 A.2d at 943 (reasoning that in assessing a director's independence the chancellor must "necessarily draw on a general sense of human nature"). The complaint depicts the institutional defendants as powerful actors in Puerto Rico's capital markets who play multiple roles in Belaval's life: employer, underwriter, investor, and gate-keeper to Puerto Rico's capital markets. For Belaval, deciding to bring plaintiffs' lawsuit would mean not only suing two institutions that are important to Triple S, but also accusing four of his co-directors – who are themselves prominent players in Puerto Rico's business community – of violating federal securities law. Considering all of these allegations together, we conclude that plaintiffs have established a reasonable doubt that a person in Belaval's position could evaluate demand in this case without "ponder[ing] the effect affirmative action on a demand would have on [his] future." In re The Student Loan Corp., 2002 WL 75479, at *3.

## 6. Vincente Leon

Finally, we examine the facts alleged concerning director Vincente Leon, which are nearly identical to those regarding Belaval. Leon is both a director of each of the Funds and a vice-chairman of Triple S. He sits on the boards of many UBS Trust affiliated funds. Under these circumstances, Triple S's past use of the UBS affiliates' financial network in a transaction similar to the ERS bonds transaction, UBS Trust's significant past purchases and current holdings of Triple S notes, the power of the UBS defendants in Puerto Rico's financial markets and the likelihood that in the future Leon will need assistance from the UBS defendants in accessing the Puerto Rican markets, lead us to conclude that plaintiffs have plead sufficient facts to create a reasonable doubt that Leon could objectively consider the demand.

**V.**

In summary, the plaintiffs' allegations have established with sufficient particularity a reasonable doubt about the ability of the six directors identified above to evaluate plaintiffs' demand to bring this action on behalf of the Funds with the disinterest and independence required under Puerto Rico law. Because the boards of directors of the Funds have eleven members, plaintiffs have established under <u>Rales</u> that a presuit demand would have been futile.  The district court erred in reaching a contrary conclusion.  Plaintiffs' derivative claims should not have been

dismissed.  We therefore <u>vacate</u> the dismissal of those claims and remand for further proceedings consistent with this opinion.[8] Costs are awarded to the appellants.

       <u>So ordered</u>.

---

[8] In light of this decision, there was no need for plaintiffs to file an amended complaint.  However, if plaintiffs wish to file an amended complaint for reasons unrelated to the sufficiency of their demand futility pleadings, they will have an opportunity to request permission to do so upon remand.